# Illinois Central Railroad Company v. Cyrus W. Cole.

1. TENDER—*Effect of, in Personal Injury Cases.*—The making of a tender in an action for personal injuries is an admission by the defendants of its liability, and the case is to be tried upon the single issue of the extent of the damages suffered by the plaintiff.

2. PERSONAL INJURIES—*Measure of Damages.*—Compensation is the measure of damages in ordinary cases of personal injuries and includes not only loss of time during the care and the expense incurred in respect of it, but also the pain and suffering undergone, and any injury of a permanent character, which constitutes a disability for further exertion and consequent pecuniary loss, or causes future pain and suffering.

3. DAMAGES—*Measure of—When Incapable of Mathematical Calculation.*—What is adequate compensation for personal injuries, is often a question of great difficulty, and is said to be incapable of mathematical calculation.

4. SAME—*$5,000 Not Excessive.*—Under the circumstances of this case, as shown by the evidence, $5,000 is held not to be excessive.

5. NEW TRIALS—*Misconduct of Counsel.*—Remarks of counsel in his closing argument, if not outside the legitimate province, are not a sufficient ground for a new trial.

**Trespass on the Case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. HENRY V. FREEMAN, Judge, presiding. Heard in this court at the October term, 1895. Affirmed. Opinion filed February 11, 1896.

*Remarks of counsel complained of:*

"There is only one question, gentlemen, before you—only one, and that is the amount of damages that the plaintiff ought to have.

During the trial, counsel for defendant said in open court, in your hearing, that they admitted the negligence of the defendant in causing this injury. They conceded that they were to blame, and not the plaintiff. If the plaintiff is to blame so that he can not recover, then the defendant is not liable, but he admitted the liability of the defendant to pay to the plaintiff whatever the plaintiff ought to have. In other words, he admitted the defendant's guilt and the plaintiff's innocence in this entire matter, and said to you—to the court—that the only question is, how much the defendant ought to pay, and he, for the defendant, undertook then and there to decide for them—for their side—how much this plaintiff ought to have—and he placed in the hands of the clerk of this court for the plaintiff one thousand dollars, and says that's enough —that's all. Without reference to what the court might think; without reference to what the plaintiff might think; without reference to

I. C. R. R. Co. v. Cole.

what the jury might believe—the defendant says: "We decide this question. We injured you. We are guilty. We did the damage—you did the suffering—here is your money—we decide just what you are to have." That is all! A thousand dollars there. We can take it and go if we want to. Pay our costs and quit—if we see fit to take his judgment—his estimate of the damages.

After doing all that—after being guilty of almost ruining the plaintiff—producing the damage and suffering—deciding the case without hearing a word of testimony—without even being sworn to decide it right—after doing all that—bringing their money into court and saying, "Take it, you will get nothing beyond that," he tells you : "Gentlemen, I did that in perfect good faith," and went on to explain what his good faith was. "I thought it was all the plaintiff was entitled to!" I know what he thought perfectly well. I don't need to be sworn to know that. He thought we would prove the defendant was guilty by the proof here, and he would rather admit it than hear it detailed from the witnesses. And he thought further that we could not show that the damages taken, together with the costs, would amount to any more than the thousand dollars. That is what he thought. Now, he thought that, I concede in good faith. I do not accuse him of any bad faith in the matter. I accuse him of trying to do the best he can for his client. I accuse him of not having one single teaspoonful of sympathy for this plaintiff—not a teaspoonful! All the sympathy, if it was the most violent kind of medicine, would not physic a cat. Because before he left the stand here he talked about him as an imposter. He talked about him as a liar. He talked about him as a fraud. He talked about him as a speculator in a court of justice. He talked about his pretending to be hurt when he was not, and where he was not and as he was not—that the statement he made before you and his God with his uplifted hand, under oath, was perjury—when he said that he was never sick in his life; that he had pains; and that all these things came after the defendants hurt him—that that was all perjury. Now, does he have sympathy for that sort of a man? I would not. In good faith! What do you mean by good faith toward a man that is a perjurer and a scoundrel and a villain and an imposter. Good faith toward him? Why, according to his statement that man ought to be in the penitentiary to-day—according to Mr. Andrews' statement. Sympathy for him! Good faith toward him! No, it was not that, Mr. Andrews—not a bit of it. You hate him, if your words are to be taken as true. You hate him. You despise him.

What was it then? Simply because he thought by making that admission of his client's guilt—that admission of the defendant's negligence, that tender, it would be better for his client. We would prove it any way, and he would keep that much of the horrible evidence from before the jury. So he conceded that.

Now, what did he admit? He admitted that on that dark night—he admitted that on that dark stormy night, when this plaintiff was run-

ning the express train on regular time—to the minute—filled with passengers.—

By Mr. Andrews : I object, your honor, there is no evidence that the train was filled with passengers—it was an express train.

By the Court : No, there is no evidence of that.

Mr. Cratty : The express passenger train of the Michigan Central road—

By Mr. Andrews : I don't think there is any evidence that it was an express passenger train.

By Mr. Cratty : Well, it is in the declaration.

By Mr. Andrews : It is not in the evidence.

By Mr. Cratty: Yes it is the declaration, charging your people with negligence; that he was running that train, and that you were negligent and caused the injury—the damage to that train—you admit the negligence charged in the declaration—now it is before the jury. You can read the declaration. You have a right to—it belongs to you. I tel you what is in it. I talk about it just as I would about the testimony of a witness, precisely; that when he, as engineer of that train, running that train on time, at the rate of about thirty-five miles an hour, as he had a right to run—even if you were a passenger you would say he must run on time, and "you must run with speed, for I want to get there"—this defendant in the dark ran its freight train on the track out of time ahead of it, and so immediately in front of him that it was impossible to stop his train—utterly impossible—but Cole stood by the lever until he reversed the engine, but it was too late—it went crashing into the cars—the freight cars of the defendant. He said he went on the train and into that business with his eyes open—eyes open, it is true, but on that dark night, snow and sleet and storm beating in his face—

By Mr. Andrews: There is no evidence here as to the character of the night at all.

Mr. Cratty: He did—I heard him say it myself.

By the Court: He said the night was dark and stormy.

By Mr. Cratty: I heard him say it myself—that he stood with one hand on the lever, and he was looking out, and it was a dark, stormy night—I heard it myself. With the snow and sleet beating in his face, he reversed the lever and stopped it and saved the life of whoever might have been in that train. Your company owes to this man, Cole, ten thousand times more than it will ever pay. By his heroic conduct, when he saw that—he hung to the lever until it dashed him nearly to his death, but he saved the people who were behind him.

By Mr. Andrews: If your honor please, I take exception to those remarks, that the plaintiff saved people that were behind him. There was no evidence that any person was behind him. I wish to note an exception to that.

By the Court: The only evidence as to that is that it was an express train running at night, at the rate of thirty or thirty-five miles an hour.

By Mr. Andrews: Your assistants know what train it was, Mr. Cratty, if you ask them.

By Mr. Cratty:  Wasn't it a passenger train?  Do you think there were no passengers on that train?

By Mr. Andrews:  It was an express train and carried only mail and express.

By Mr. Cratty:  And no passengers?

By Mr. Andrews:  None, except possibly the employes.

By Mr. Cratty:  How many?

By Mr. Andrews:  Ask Mr. Cleveland, he knows the facts, or you can ask Mr. Cole.

By Mr. Cleveland:  It was an express train.

By the Court:  As far as the facts are concerned, the jury has heard the evidence.  I do not think we need waste much time for discussion between counsel, or for the introduction of new evidence.

By Mr. Andrews;  I note an exception, your honor, as to his remarks about saving the passengers."  *  *  *

" Now, let us estimate, and for the purpose of this estimate I would be perfectly willing that Brother Andrews himself should take the seat and be sworn and render the verdict   Assuming now, as I am going to assume, that a jury may find that a scar is worth a little more than Brother Andrews seems to think it is—what will Brother Andrews take and have that scar on his handsome brow with the signs of the old stitches in it?  Not any money that you will give in this jury box. What will Mr. Andrews take and know that any moment in the day he is liable to be killed—

By Mr. Andrews:  I don't like to interrupt—but that is not the true measure of damages, and I think it is just to the defendant that I call the attention of the court to it.

By Mr. Cratty :  Very well, if he doesn't want me to talk to him I won't any more—I won't any more—no, I won't any more—I will tell you what I will do, though, gentlemen—I will say what will any man take—he can take it to himself if he has a mind to, and you can think of him while you are deciding, if you want to—what will any good looking man take and take that scar with it?

By Mr. Andrews :  I object—I take exception to that statement as not the correct statement of the law.

The Court :  I think that perhaps is within the proprieties, to comment on the evidence in that way.

By Mr. Andrews :  I note an exception to it."

SIDNEY F. ANDREWS, attorney for appellant; JAMES FENTRESS, of counsel.

The damages awarded are excessive.  C., B. & Q. R. R. Co. v. Avery, 10 Ill. App. 210; C. & E. I. R. R. Co. v. Holland, 122 Ill. 461; Consolidated Coal Co. v. Haenni, 146 Ill. 616; C., B. & Q. R. R. Co. v. Hines, 45 Ill. App. 302.

The court erred in allowing plaintiff's counsel to make improper statements in his argument to the jury.   C. C. Ry. Co. v. Barron, 57 Ill. 470; Tucker v. Henniker, 41 N. H. 317; Nelson v. Welch, 115 Ind. 270; Freeman v. Dempsey, 41 Ill. App. 554; Holloway v. Johnson, 28 Ill. App. 463; L. S. & M. S. R. R. Co. v. May, 33 Ill. App. 366; O. & M. R. R. Co. v. Cullison, 40 Ill. App. 67; E. J. & E. R. R. Co. v. Fletcher, 128 Ill. 620; Whitsett v. C., R. I. & P. Ry. Co., 67 Iowa, 150; Florence Cotton & Iron Co. v. Field, 16 So. Rep. 538; C. & A. R. R. Co. v. Johnson, 116 Ill. 208; M. M. & Mfg. Co. v. Erling, 148 Ill. 521; Henry v. Centralia & C. R. R. Co., 121 Ill. 264.

CRATTY, MacLAREN, JARVIS & CLEVELAND, attorneys for appellee.

A court hearing counsel, under pretense of arguing a case, making statements of matters to the jury not in evidence, nor pertinent as illustrative of matters in evidence, should promptly stop the counsel, explain to the jury the impropriety of his language, and take such measures as shall be proper to prevent a repetition of such misconduct, and for a failure of duty in that respect manifestly affecting the result, the judgment should be reversed.   But the counsel whose client is unfavorably affected by such statements should call the attention of the court to them at that time, for it might be that being preoccupied with other matters they would escape his attention.   E. J. & E. R. R. Co. v. Fletcher, 128 Ill. 619, 627.

The remarks of counsel were not improper: Holloway v. Johnson, 28 Ill. App. 465; C. & A. R. R. Co. v. Johnson, 116 Ill. 210; Monmouth Mfg. Co. v. Erling, 148 Ill. 533; Henry v. C. & C. R. R. Co., 121 Ill. 268.

MR. JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

This is an action on the case to recover damages for a personal injury.

On December 31, 1891, the appellee, aged forty-one years, was in the service of the Michigan Central Rail-

road Company as a locomotive engineer. On the night in question he was operating a Michigan Central engine, pulling a train of cars loaded with express matter, between Chicago and Michigan City, Indiana. This train was running over the tracks of the Illinois Central Railroad Company, and somewhere in the neighborhood of the town of Pullman, in Cook county, appellee's engine collided with a freight train belonging to the Illinois Central Railroad Company, which latter train, in charge of the Illinois Central Railroad Company's employes, had been pulled out from the side track onto the main track, on which appellee was driving his engine, the result being a collision between the engine on which the appellee was riding and the said freight train. To avoid the effect of the said collision, the appellee, Cole, jumped or attempted to jump from his engine, and alleges that he received the injuries complained of by reason of so jumping, or from being thrown from his said engine.

On the trial of the cause, and after the jury had been impaneled and sworn to try the issues, and immediately following the opening statement of appellee's counsel, the appellant, by its counsel, tendered to the appellee the sum of $1,000 in lawful money of the United States, to compensate him for the damages he had received and for the costs incurred by him in this suit, which tender was refused by the appellee, and upon such refusal the appellant, under an order of the court, paid said sum into the hands of the clerk of said court, whereupon the cause proceeded to trial, resulting in a verdict for the plaintiff for $5,000. Appellant's motion for a new trial having been overruled and judgment entered on the verdict, the appellant was granted an appeal to this court.

Probably the making of such tender was an ample admission by the appellant of its negligence and thereby its liability, and of the right of appellee to recover, but such admission was made certain by express admissions made by counsel for appellant at the inception of the evidence offered by appellee. The case was, therefore, tried upon the single issue of the extent of the damages suffered by appellee.

The grounds urged for a reversal of the judgment are that the damages are excessive, error in plaintiff's instructions, and improper statements by counsel for appellee in his closing argument to the jury.

Upon the question of the amount of the damages the testimony showed that the appellee was knocked senseless by the collision; that he did not recover his senses until he was lying on the surgeon's table in St. Luke's Hospital, after his wounds had been dressed and stitched. The distance from Pullman to the hospital is, to our knowledge, about eleven miles.

The superintending surgeon of the appellant, who was also connected, as surgeon, with St. Luke's Hospital, and called as a witness for the appellant, testified, on direct examination, concerning appellee's injuries, as follows, as shown by the abstract:

"Mr. Cole was under my care in St. Luke's Hospital for about six days, and I have examined him on two occasions since that. I remember the extent of his injuries as I found them when he came to St. Luke's Hospital. He had a severe bruise in the locality of the hip. It was black and blue somewhat, and also on the outer part of the thigh, extending downward, shading out in the color of the natural skin below the knee. Also some swelling of the part and tenderness, and he complained of a good deal of pain around the hip and the outer part of the thigh; that is, the fleshy part of the hip and down the fleshy part of the thigh on the outer side, chiefly from the hip bone, backward and downward, just below the small of the back.

Q. Did the bruise extend up to the small of his back?

A. No, the bruise seemed to be limited about on a line backward with the hip bone; it did not extend in the small of the back, according to my recollection. In addition to this, he had two or three cuts of the scalp, one somewhat extensive, about five inches. His skull was not injured. He remained in the hospital about six days. When he left he had the same symptoms, except in a less degree. The only operation performed on him was the stitching of the

scalp. After that, the first examination that I made of him was in May, 1892, in his attorney's office. I found the scars had healed, and the blood discoloration caused by the bruise had disappeared. The swelling I think had disappeared. I noticed at this examination that he had varicose veins in his left leg. This was in May, 1892. Did not complain to me then of any suffering from the spine and spinal cord. He complained of pain and soreness in the locality that had been bruised, and I think in the leg below the knee. I have no recollection of any complaints in reference to the spinal cord or spine. He did not complain to me at that time, nor was my attention directed by him to any trouble of the bladder or kidneys. I examined him again October 20, 1894. The second examination was held at his attorney's office. At that time, I think, he had about the same complaints to make substantially. I found varicose veins existing, but nothing else to my recollection. I do not remember that he made complaint to me then about his bladder or his spine.

Q. Doctor, did you recommend to him to wear an elastic stocking any time while he was in St. Luke's hospital those six days? A. Well, I hardly think so. My recollection is that some time or other, I recommended him to wear an elastic stocking, but I think it was after I had seen him on one of the occasions referred to, and it might be possible that I did before he left the hospital. We often use elastic stockings for swellings resulting from injuries; often in inflammatory swellings or swellings arising from bruises; it stimulates the absorbent vessels to take up the suffused material. A bandage is used, but patients can use the elastic so much better than the bandage, that I might have recommended him even there to use one; I don't know.

I see a great deal of varicose veins in the course of practice; it is very common in both sexes. It is due ordinarily to a dilatation or enlargement of the veins and a spoiling of the valves, so that they can not support the column of blood which is going right up the leg to go back to the heart again. The veins become enlarged, and irregularly en-

larged, so that the leg looks somewhat knotty—all made up by the enlarged vein.

Weakening of the vein walls and spoiling of the valves would seem about the mechanism of varicose veins. It comes from weakening of the walls, or spoiling of the valves, or both. The cause of the weakening of the veins is thought to be due to a strong hereditary influence. The vein walls are weak in families, and hence we see varicose veins sometimes in several members of the same family; and, whatever the strength, if the vein walls are not able to overcome the resistance of the blood inside, then there is a gradual dilatation of the vein by wearing of garters and any constriction around the leg; and I might say that the books mention frequently occupations in the upright position will produce this trouble, although in my opinion the upright position ought not alone to cause it. Anything that presses the vein habitually would favor an enlargement below; if the pressure were continued in a moderate way veins would become weakened and enlarge in time and the valves spoiled, and whenever the valves are spoiled, varicose veins in time develop. Injury might cause these veins in time, but it is seldom mentioned in the books on surgery, so that I think it is somewhat rare. Their development is very slow. The vein must gradually enlarge and dilate and it can not abruptly do so. It takes time for that.

I have heard the testimony given by the plaintiff as to how he got injured, and the time in which it is said the veins developed, that is, within two or three weeks; and I will say that there are some very doubtful points connected with it. The fall from an engine might cause injury and contusion of a vein, or a rupture, say, of one of the coats of the vein, of which there are three, and if one coat is lacking, then there would be a weak place, and there would be the conditions present for a varicose vein subsequently; but the doubtful point I referred to was how such a development of varicose veins should exist in even three or four months; that part of it I can not understand. It must take time for such an enlargement. An injury to the spinal cord is

considered a serious injury.   The spinal cord is considered one of the most sensitive parts of the human organism; that, and the brain and the eye.

Q.   What usually results when the spinal cord is injured?   A.   A patient is laid up, disabled; has paralysis, and he is in such a condition as to disable him.   He is not able to perform his duties, whatever they may be, except it may be mental work.   I think it would usually prevent a patient from carrying on the work of a locomotive engineer.   I do not know of any such in that capacity.

Q.   Do you think a man could go hunting and fishing a few months after an injury to the spinal cord?   A.   Well, I would hardly expect he would find it sport, and I think he would be disabled from so doing.

Q.   In your examination of the plaintiff at any time, did you find any symptoms of an injury to the spinal cord?   A. No, I did not.

Q.   Did you find any symptoms in any of your examinations of an injury to the spine?   A.   No.   The discoloration from bruises might disappear within three weeks, and yet the bruise have been quite severe.

Q.   You heard the description by Mr. Cole of his bladder trouble, yesterday, did you not?   A.   Yes, I heard him say his urine is high in color and had some sediment.

Q.   And he frequently had to urinate?   A.   Yes.

Q.   In your opinion, is that due to the injury received by Mr. Cole?   A.   Well, I could not say whether it was or not.   I don't think the information on that point is sufficient to enable one to determine whether he had discoloration of urine or sediment in the natural way or not.   It takes an examination of the urine, and several specimens of it, to determine what is wrong, if anything.   Such conditions would arise from very many causes other than a bruise and accident such as described by the plaintiff, viz.:   a stricture of the urethra would cause it; a bruising might cause it; but it would be noticeable in the earlier weeks of the case;   might be caused by disease of the spinal cord, and by other diseases;   might be caused by too great acidity of the

urine; and on the other hand it might be caused by the opposite conditions; it might be caused by disease of the kidneys.

Q. There are a great many people afflicted with bladder trouble, aren't there, who never had a fall or a bruise? A. O, yes; an immense number. It is a very prevalent trouble and is quite common."

And on re-direct examination he testified:

"Q. Do you consider the varicose veins as a trouble that is likely to shorten one's life? A. Well, I would say no, in the cases of intelligent people and where they have been looked after. If a laceration of the leg exists over one of these, the patient may bleed to death, but not if proper treatment is used to cure the laceration, and when the veins become bad enough to operate on such of those as are most superficial, just barely covered by the skin, then there is not any shortening of life, that I can see, arising from varicose veins.

Q. Do you consider an operation performed for the cure of the varicose veins when taken in time a very serious operation to the patient? A. No, it is not a very serious operation nowadays. It is not very often done. When there are lacerations, varicose veins are more apt to occur than in the normal condition."

The appellee testified concerning his injuries substantially as follows, as collected from the abstract:

Plaintiff states that he began firing a locomotive engine in 1868, and that he has been in the railroad service nearly all the time since then; that up to the time of the accident his health was first class; that he was considered to be a very strong man. Before the accident he never had any trouble with his back or with his legs, or with his bowels or with his urine. That he was a married man; that his family consisted of one child; that he would be forty-four years old on the 18th of July. States that his health was good; that he never was sick a day in his life, that he knows of; that before the accident his injured leg was all right and was just the same as the other one; that before the accident his

ability to work nights and in bad weather was good; that prior to that event he sometimes did extra work; that before the accident weather did not affect him in any way, nor was his ability to sleep affected; that prior to that occurrence there were no scars on his head.

"Q.   Did you have any varicose veins in your leg or any trouble with your left leg?   A.   Not that could be seen.

Q.   Well, did you have any trouble with your left leg? A.   No, sir.

Q.   Did it pain you in any way?   A.   No, sir."

From the time he was a boy down to the time of the accident he never had any sickness or disability.

Plaintiff does not know anything about what occurred from the time of the collision until he found himself on the operating table in St. Luke's Hospital. After he became conscious the cut on his head was sewed up.

He thinks bandage remained on his head for ten or eleven days when the stitches were taken out of the wound; does not know how many stiches were taken; states that he was in St. Luke's Hospital six days; from there he went to his home at Michigan City, where he says he was laid up for four months lacking six days; states that he returned to work on the first day of May, 1892; that Dr. Tillotson took the stitches out of the wound on his head at Michigan City.

Witness takes off his trousers and drawers and exhibits his leg with varicose veins to the jury, and states that before the accident it was perfectly sound and exactly like the other leg, stating that the varicose veins extend above the knee clear to his body.

"When I got to Michigan City and the physician was examining me there and looking at the leg, the leg was bruised along here; it was black and blue up here; my hip was black and blue around here and my foot was black and blue and was swollen very bad.

Q.   How long before these big veins began to appear after the accident?   A.   I should judge about three weeks. The other leg was not bruised any in the accident."

Witness states that he has been required to wear an elas-

tic stocking since the 1st of May, 1892; that the one he has on at present is the seventh one; that the first physician who recommended the use of such stocking was Dr. Gill. Witness states that he also drew Dr. Owens' attention to it the day he left St. Luke's Hospital, and that Dr. Owens told him he would have to wear the elastic stocking.

Changes in the weather affect his leg; when it is raining, bad, disagreeable weather, the leg aches and it is numb; that at no time is there the feeling in it that there is in the other leg. States that varicose veins in his leg have been getting worse all the time, that the injury to the leg sometimes makes him walk lame, that the effect of striking his leg against anything makes it hurt him; that it was three weeks before the black and blue disappeared from the leg. Witness also states that he received an injury in the back; that he was hurt across the left side of the small of the back and this hip; that he has aches and pains in the back; that before the accident he did not have such pains all the time; that in damp, wet, rainy weather he suffers more than at other times; that such pains get worse as time goes on. Witness also states that since the wreck he has had to take medicine all the time for trouble with his bowels; that since the accident he is bound up, and that unless he takes medicine he would not have a discharge probably in three and four, sometimes five, days.

Witness can not state that such constipation is increasing or getting less as the time goes by. He never was troubled with constipation before he was injured.

" Q. Did you notice any change after the accident in regard to your urine, your water works ? A. Yes, sir, I have."

Witness stated that when he wanted to make water he wanted to do it right there and then, and does not think that there is a day that passes that he does not draw his water at least calculation fifteen times a day, and lots of times four and five times on coming over the road on the engine; that the run on his engine occupies about an hour and thirty-five minutes; that he never had any trouble of

that kind before the accident, and he did not have to draw his water more than twice or three times a day, sometimes four; that during the run from Michigan City to Chicago he would sometimes not urinate at all.

Witness states that he paid out for nursing at St. Luke's Hospital the sum of $7.25, that since that the bill of Dr. Tillotson of Michigan City is $80, and that he has paid out for elastic stockings the sum of $23.

The cross-examination of appellee does not appear to have resulted in any material alteration of his testimony as stated.

Doctor Tillotson, the physician and surgeon at Michigan City, who was referred to by appellee, testified that he had been appellee's family physician for over ten years; that he was called to see appellee after he came home from Chicago about a week after the injury, and "found him with a wound upon the left side of his head extending to the forehead and about five inches in length. Plaintiff was also bruised on the left hip in the region of the joint and above. There was some swelling in that neighborhood. There was a discoloration of the outer surface of the limb to the ankle, and from the knee to the ankle the leg was practically all discolored. His foot was swollen and at that time he had some little fever. He was not able to be up, and I administered the usual remedies. I was called again within twelve hours to administer opiates to quiet pain, which I did. That was about all I observed at that time. The treatment that I gave him was that I dressed his head after the bandages became soiled, and applied liniment to his limb and back, and placed his limb in a position to ease it as much as possible, advising as to his diet, and also gave him other medicine, like laxatives, as he needed it. I probably prescribed for him three months. The swelling, if my memory serves me, lasted three weeks. I did not observe any development of varicose veins in his leg when I first visited him, not until after I had been treating it two or three weeks. They were not as pronounced then as they are now. They have since increased. His head practically healed up within two

weeks. I got him one of the elastic stockings about six weeks or two months after the varicose veins developed."

Witness states that in his opinion the veins in question would gradually get worse, and that there is hardly anything to be done for them, except an operation to remove the varicosity or wear elastic stockings. "The probabilities are that if an operation is delayed the veins will increase and the operation would be so extensive it would not be advisable. The probabilities are that these veins will remain in this condition during the plaintiff's life, unless there is an operation, and then there is no positive assurance that there will be a cure. I believe about fifty per cent recover with the operation, and none without it. The effect of remaining on one's feet makes these veins more painful; although some recommend mild exercise, walking and so on, as a benefit, while others consider it injurious; in my opinion, too long standing on the feet is injurious."

In witness' opinion, the fact of a man having varicose veins does not have a tendency to greatly shorten the probability of his life, but is simply a very painful affection, and of course incapacitates him from performing such labor as he could otherwise do.

It was shown that appellee had in fact lost no more time by reason of the injury than the four months immediately following the accident; that from the expiration of that time he followed the identical employment pursued by him before, and at the same wages, and, we may say, pursued the same pleasures and recreations, though with some less freedom of action, as before.

We do not pretend to have given all the evidence concerning the extent of the injury, but only such part as there can be not much, if any, dispute about.

From all the evidence it is plain that the judgment is for much more than the actual pecuniary loss suffered by the appellee up to the present time, and that he may surely suffer in the future.

But such is not the only measure of damages in such cases.

I. C. R. R. Co. v. Cole.

Compensation for the injury is the measure. Such compensation includes not only loss of time during the cure, and the expense incurred in respect of it, but also the pain and suffering undergone, and any injury of a permanent character which shall constitute a disability for further exertion, and consequent pecuniary loss, or cause future pain and suffering. Coal Co. v. Haenni, 146 Ill. 614.

What adequate compensation, so measured, may fairly be said to be, under the evidence in this case, is a question of very great difficulty.

We might have found a less sum, and probably would have done so, but how much less? Is it excessive to award $5,000 for injuries such as were received? The appellee was in the prime of life and in perfect health. His earning capacity was about $125 a month in the capacity of locomotive engineer, his chosen and long-time pursuit. He is suddenly severely injured, with the result of an entire incapacity from pursuing his usual avocation and pursuit for four months, and other partial disabilities which the evidence tends to show may, and some of which probably will, last for his lifetime.

Compensation in such cases has been said to be incapable of mathematical calculation. C. M. & St. P. Ry. Co. v. Wilson, 35 Ill. App. 346.

To what arbitrament then, may such questions be referred, in greater confidence of a fair determination and a correct result, than to a jury, the mode prescribed by law, where it can not be clearly seen that prejudice or passion entered into their finding? We can not say in this case that our opinion is more reliably accurate than was that of the jury, and therefore we ought not to disturb their finding.

We do not think it necessary to reproduce the instructions with which fault is found. They seem to be within established rules and in no respect materially erroneous.

On the remaining question, our opinion is that the remarks of counsel for appellee in his closing argument, were not outside the legitimate province of counsel.

The judgment of the Superior Court will therefore be affirmed, and it is so ordered.   Affirmed.