# Franklin Parmelee *et al.*

## *v.*

## Daniel Lawrence.

1. RELEASE — *of one of several obligors.* Where a release is given to one of several obligors, which is to operate as an absolute discharge of such obligor, it will also operate to release his co-obligors, notwithstanding the instrument contains an express provision that such co-obligors shall not thereby be released.

2. SAME — *ignorance of its legal effect.* The mere fact that when a release is executed the parties are ignorant that its legal effect will be to discharge the co-obligors, will not prevent its so operating, if executed and delivered unconditionally and without reference to its bearing upon other parties.

3. But it seems, if such an instrument provides, in terms, that the obligor seeking to obtain the release shall remain subject to the right of contribution in favor of his co-obligors in case they are compelled to pay more than their share of the claim, then the provision in the release that it shall not operate to discharge such co-obligors may be given effect according to its terms.

4. SAME — *intention of the parties.* But a release, like every other written instrument, must be so construed as to carry out the intention of the parties, as sought in the language of the instrument itself, when read in the light of the circumstances which surrounded the transaction.

5. So, where A receives a contract from B, knowing that it was designed by B to receive a certain interpretation and only to be used for a specific purpose, A has no right to give it a different interpretation, or to use it for a different purpose, although the purpose to which it may be diverted should be consistent with the language of the instrument itself.

6. So where an obligee executes to one of several obligors an instrument which, in form, is a release of such obligor, with a provision that it is not to operate as a discharge of his co-obligors, while the legal effect of the words used in the contract would be to release all, yet, if, when read in the light of the circumstances attending its execution, it appear that the party making the contract did not intend it to have that effect, and the party receiving the contract, knowing such intent, pretends that it will not operate to discharge the co-obligors, who were, in terms, expressly excluded from the operation of the release, — then the instrument will be construed merely as a covenant not to sue, not operating as a technical release, but leaving the co-obligors still liable, and entitled to contribution from the party seeking the release.

7. MORTGAGE — *what constitutes.* An absolute conveyance of property for money borrowed, with covenants back as a part of the same transaction, that upon the payment of the debt so created such property shall be reconveyed, amounts merely to a loan of money and a mortgage to secure its payment.

8. COVENANT TO RECONVEY — *nature of title.* And a covenant by the mortgagee to reconvey the premises by "good and sufficient deed," will be construed as a covenant to pass the same title conferred by the original conveyance.

9. INTEREST — *of recovery when contract is usurious.* After a transaction has been closed, usurious interest cannot be recovered back. But if the transaction is yet open and the debt unpaid, a court of chancery, in stating the account, will allow as a credit upon the principal whatever usurious interest may have been paid.

10. SAME — *construction of act of* 1867. The act of 1867, which provides that in suits upon written contracts made while the interest law of 1849 was in force, and before that of 1857 was passed, no portion of the usurious interest which the debtor may have voluntarily paid shall be deducted from the principal, can be given only a prospective operation in that regard, and cannot apply to usurious interest paid before its passage, because, as to such interest, under the law as it then existed, there was a vested right to have it deducted from the principal.

11. But that portion of the act of 1867 which takes away the three-fold forfeiture given by the act of 1845, may operate upon contracts made before its passage, as the law recognizes no vested right in a penalty which the legislature may not take away.

APPEAL from the Superior Court of the city of Chicago.

The facts are sufficiently stated in the opinion of the court.

Messrs. McALLISTER, JEWETT & JACKSON, C. BECKWITH, SIDNEY SMITH and Messrs. GOODRICH, FARWELL & SMITH, for the appellants.

Mr. CHARLES A. GREGORY and Mr. ISAAC N. ARNOLD, for the appellee.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court

On the 15th of September, 1856, Parmelee, Gage, Johnson and Bigelow, partners, doing business in Chicago under the name of F. Parmelee & Co., borrowed of Daniel Lawrence, of Medford, Massachusetts, the sum of $50,000. To secure its payment in five annual installments, with ten per cent interest, they conveyed to Lawrence certain real estate situate in the city of Chicago, a part of which was held by

them under a long lease, and a part under a contract of purchase. Their deed to Lawrence refers to these instruments, and binds the grantors to pay the rent and the unpaid purchase money, and the grantors covenant that the premises are free from all incumbrances, "except the said lease and articles of agreement." The deed also contains a covenant for quiet enjoyment. Contemporaneously with the execution of this deed, a contract was executed by and between the same parties which was, in form, a contract of sale for the same premises, and by the provisions of which Parmelee & Co. agreed to pay the $50,000 in five annual installments, with ten per cent interest, and Lawrence covenanted, upon such payment, to convey to them the premises free from all incumbrances, by good and sufficient deed. Parmelee & Co. also executed a separate instrument by which they agreed to pay an additional interest of two per cent per annum as long as the debt should remain unpaid. They paid the interest at twelve per cent to April, 1861, but none of the principal. From that date they ceased to pay. On the 4th of August, 1864, Parmelee, Gage, and Bigelow, filed their bill in chancery against Lawrence, in which, concealing the true nature of the transaction, claiming that they were purchasers from Lawrence, and suppressing the fact that they had conveyed to him, they set out the contract, aver their readiness to pay, but also aver that Lawrence was unable to convey to them a perfect title according to his covenants in the contract, as he had not the fee in the premises, but was nevertheless threatening to take legal steps to collect the money and to evict them from the premises. The bill was sworn to by one of the complainants, and prayed an injunction, which was granted. Johnson did not join in this bill, as the other partners had purchased his interest.

Lawrence answered, and also filed a cross-bill, setting forth the true nature of the transaction, bringing before the court the deed from Parmelee and his co-complainants to him, and claiming that the entire transaction amounted merely to a loan of money and a mortgage to secure its payment. He prayed a decree that the debt be paid or the premises sold.

On the 24th of September, 1864, Bigelow, Gage & Parmelee filed their supplemental bill, wherein they set up that, on the 12th day of August, 1864, at Boston, Mass., Bigelow had a settlement with Lawrence, of the moneys due Lawrence under the articles, and that Bigelow paid Lawrence $22,557, in full satisfaction of Bigelow's share, and that Lawrence then and there, without the knowledge or consent of the appellants, executed, under his hand and seal, and delivered to Bigelow, the following instrument:

"Received, Boston, August 12th, 1864, twenty-two thousand five hundred and fifty-seven dollars, of Liberty Bigelow, in full payment of his portion of all money due me on articles of agreement between myself, him (said B.), F. Parmelee, D. A. Gage and W. S. Johnson, dated September 15, 1856, and recorded in the recorder's office of Cook county, Illinois, October 17th, same year, in book 171 of deeds, page 71; and I release and discharge said Bigelow, his property and estate, from all claims on account of the same.

"If the property mentioned in the above articles has to be sold under any order of the court at Chicago, the interest of said Bigelow in it is to be protected according to this settlement. Nothing herein contained shall in anywise affect my rights or demand against said Parmelee, Gage or Johnson, or their interest in said property.

"DANIEL LAWRENCE." [Seal.]

[U. S. Rev. stamp.]

They claimed that, since their covenants in the articles were joint covenants, therefore this agreement and receipt to Bigelow was a satisfaction, in law and in fact, of all the moneys due Lawrence. They prayed the relief prayed in their original bill, and further, that their covenants in the articles be decreed to be discharged, and that they might be decreed discharged from all claims of Lawrence for money upon the articles, and that Lawrence reconvey and discharge all lien of record.

They also filed an additional answer to the cross-bill, setting up this release. Lawrence answered the supplemental bill,

setting up that he had been induced to execute the release by the fraudulent representations of Bigelow. Replications were filed to the various answers and proofs taken, and on the final hearing the Superior Court held that the release obtained by Bigelow did not discharge his co-obligors, and decreed the payment of the amount due Lawrence, allowing him to retain the twelve per cent interest paid, but giving him only six per cent from the date of the last payment. Parmelee, Johnson and Gage appealed to this court.

It is at once apparent, that this case turns upon the effect to be given to the release. The pretext upon which the original bill was based — that Lawrence had sold and covenanted to convey to the complainants a perfect title in fee simple, which he was not able to do — vanishes the moment the true character of the transaction is brought to light. As has been often decided by this and other courts, the deed from the appellants to Lawrence, and the contemporaneous agreement by which they covenanted to repay a certain sum of money at that time borrowed, and Lawrence covenanted upon such payment to reconvey to them the premises, constituted but a mortgage. The covenant of Lawrence that he would reconvey the premises free from incumbrances, and by good and sufficient deed, must of course be understood as referring to the same title that he had received from them. That title he was bound to give back to them free from any incumbrance done or suffered by him. They had themselves, in their own deed to him, covenanted that the premises were free from incumbrances and for quiet enjoyment, and that they would themselves pay the rent of the leasehold property, and the unpaid purchase money upon that portion of the premises held under a contract of sale. In the face of these covenants, and in view of the fact that Lawrence merely held these premises as security for the repayment of a loan, to construe his contract to reconvey as binding him to convert the imperfect title he had received into an estate in fee simple is impossible. Such a construction would utterly pervert the intention of the parties.

The difficult question in this case relates to the effect to be

given to the instrument executed by Lawrence to Bigelow. If it is to be regarded as an absolute and unconditional release of Bigelow, it must also operate as a discharge of his co-obligors, and the mere fact that, when a release is executed, the parties are ignorant that such will be its legal effect, will not prevent its so operating, if executed and delivered unconditionally and without reference to its bearing upon other parties. But a release, like every other written instrument, must be so construed as to carry out the intention of the parties. This intention is to be sought in the language of the instrument itself when read in the light of the circumstances which surrounded the transaction. The court which interprets must place itself as nearly as possible in the position of the parties when they acted. There is also another rule of construction which applies in the present case. If A receives a contract or other instrument from B, knowing that it was designed by B to bear a particular interpretation and to be used only for a specific purpose, then A has no right to give it a different interpretion, or to use it for a different purpose, though such new purpose may be consistent with the language of the instrument. To permit A to pervert the instrument from the purpose for which he knew it was intended by B, would be to permit him to commit a fraud. This rule is founded upon the plainest dictates of natural justice.

Now, for what purpose, and with what limitations, did Bigelow know this instrument to be executed by Lawrence and delivered to himself? The answer admits of no doubt, when we recur to the language of the instrument and to the circumstances attending its execution as detailed in the evidence. Bigelow was in Boston for the purpose of procuring a release, and there was with him his attorney from Chicago with whom he was in consultation during his negotiations with Lawrence, though the attorney and Lawrence seem to have been studiously kept apart. The attorney first drew what he terms a straight release. When Bigelow presented this to Lawrence, the latter refused to sign it, from the apprehension that it might jeopardize his claim against the co-obligors. The attorney drew a

second release somewhat modified in form. This, also, Lawrence refused to sign, insisting that the instrument to be signed must contain an express reservation of all his rights against the co-obligors. Finally, the instrument was drawn as we now find it, and this Lawrence was willing to execute, containing as it does an express provision that the instrument should in no wise affect his rights or demands against Parmelee, Gage and Johnson. What then was the purpose for which Lawrence executed this instrument, and for which, and for which only, Bigelow *knew* he executed it? The answer admits of no hesitation or doubt. It was executed for the purpose of saving Bigelow from further legal liability so far, and only so far, as this could be done without affecting the claim of Lawrence against the co-obligors. A release which it was thought would impair those claims, he had steadily refused to sign. This was prepared with the special reservation of all his rights, and for the purpose of removing the objection taken to the others. Bigelow must have presented this final instrument to him as one which, by its express language, would remove all the difficulties which made Lawrence refuse to sign the others. Would it not then be a fraud upon Lawrence, and a most palpable perversion of the purpose for which Lawrence executed, and Bigelow professed to receive, this instrument, if we should now permit Bigelow to turn about and say, the instrument was an absolute release, by which his co-obligors are also discharged? On the contrary, common honesty requires that he shall claim for this instrument only such effect as it was designed to have, and that it shall be treated merely as a covenant not to sue. In this way its objects will be carried out. Bigelow will be protected from a legal enforcement of the claim on the part of Lawrence, but will be left liable to contribution at the suit of his co-obligors if they are compelled to pay more than their *pro rata* share of the claim. To this contingent liability, however, he assented when he inserted in the instrument a reservation of the rights of Lawrence against them. Indeed we regard this instrument as if it had provided upon its face that Bigelow should still be subject to the right of contribution in favor of his co-obligors.

If it had done so in terms, there could be no controversy about this case, since the reason why a release of one of several obligors discharges all, is, that by such release the right of contribution is cut off. Of course if that right is reserved, the release should be construed as a simple covenant not to sue, leaving the liability of the co-obligors unimpaired. The reason of the rule failing, the rule itself should cease, the more especially when its application would work injustice.

The position which Parmelee, Gage & Bigelow occupy through this entire record, is not one which entitles them to favorable consideration in solving whatever doubts there may be as to the manner in which this instrument is to be interpreted. They filed their original bill for the purpose of evading, upon pretexts that were simply frivolous, the payment of a perfectly honest debt contracted for money borrowed. They obtain an injunction by utterly misrepresenting in their sworn bill the true character of the transaction, claiming to occupy the position of purchasers, when in fact there had been not one element of a purchase. When the answer and cross-bill bring the actual state of facts before the court, they cast about for another mode of evading payment of an honest debt. Bigelow, a kinsman of Lawrence, and as such the better able to deal with him at advantage, goes to Boston to make an arrangement. The attorney of the appellants also goes east, and by appointment meets Bigelow in New York. The plan of procuring a release for Bigelow had been already under consideration in Chicago, as declared by the evidence of Gregory. Bigelow and his attorney proceed together to Boston. The attorney is at hand for consultation, but is not brought in contact with Lawrence. As we have before stated, several releases are drawn, which Lawrence suspects may impair his claim against the co-obligors, and which he, therefore, refuses to sign. Finally one is prepared with the proper reservations, which he is led to suppose he may sign with safety, and he signs it. Bigelow immediately delivers it to the attorney for the purpose, as the attorney testifies, of taking it to Chicago to be recorded. On the next day, the 13th of August, the attor-

ney starts for Chicago, and on arriving at the railway station in that city he is met with the intelligence of the illness of an acquaintance who desires to see him at his house. He goes at once to see him, but before going sends the so-called release to the recorder's office, and on the 16th it is reduced to record. A new answer and a supplemental bill setting up the release are at once filed, and the parties repose upon the belief that they have finally succeeded in evading the payment of a goodly portion of the borrowed money. It is impossible to read the evidence in this case, disclosing the above facts, without a conviction that this whole scheme of procuring a separate release to Bigelow was a plan contrived in Chicago for the purpose of escaping the full payment of the debt. It was a dishonest scheme, and it is our duty so to pronounce it.

In view of all these facts, we have no hesitation whatever in holding, that neither Bigelow nor his co-obligors can pervert this instrument to a use for which it was never intended, or that it can be made to have any other effect than to protect Bigelow from further legal pursuit on the part of Lawrence, but leaving the other co-obligors liable, and Bigelow liable for contribution, if the circumstances of the case should require it.

On the question as to the effect of this release, counsel for appellants have cited the cases of *Benjamin* v. *McCormick*, 4 Gilm. 536, and *Rice* v. *Webster*, 18 Ill. 331. It will be observed from what we have already said that there are facts in this case which widely distinguish it from either of those. We would further add that the weight of the modern authorities is against these cases, and in favor of the more reasonable rule, that where the release of one of several obligors shows upon its face, and in connection with the surrounding circumstances, that it was the intention of the parties not to release the co-obligors, such intention, as in the case of other written contracts, shall be carried out, and to that end the instrument shall be construed as a covenant not to sue. Parsons, in his work on contracts, volume 1, page 24, uses the following language: "But though the word 'release' be used, even under seal, yet if the parties (the instrument being considered as a whole, and

in connection with all the circumstances of the case and the relations of the parties) cannot reasonably be supposed to have intended a release, it will be construed as only an agreement not to charge the person or party to whom the release is given, and will not be permitted to have the effect of a technical release; for a general covenant not to sue is not of itself a release of the covenantee, but is so construed by the law to avoid circuity of action; and a covenant not to sue one of many who are jointly indebted does not discharge one who is a joint debtor to the covenantor, nor in any way affect his obligation." This rule is substantially so laid down in the following cases: *North* v. *Wakefield*, 66 Eng. C. L. 536; *Willis* v. *DeCastro*, 93 id. 215; *Sully* v. *Forbes*, 2 B. & B. 46; *Kirby* v. *Taylor*, 6 Johns. Ch. 242; *Clagett* v. *Salmon*, 5 Gill & Johns. 351; *Lysaght* v. *Phillips*, 5 Duer, 116; *Wiggin* v. *Tudor*, 23 Pick. 444; R. M. Charlton (Geo.) 267.

There remains to be considered only the rate of interest to be allowed Lawrence. We have decided, in several cases not yet reported, that, although, after a transaction has been closed, usurious interest cannot be recovered back, yet, while the transaction is yet open and the debt unpaid, a court of chancery, in stating the account, will allow as a credit upon the principal whatever usurious interest may have been paid. The Superior Court should, therefore, have allowed the appellants credit, as a payment upon the principal, for the usurious two per cent paid by them during several years after the money was borrowed.

Counsel for the appellee have insisted that the law passed at the last session of the legislature to be found under the head of "contracts," page 81, Laws of 1867, must control this case in that respect. That law provides, that, in all suits on written contracts made while the interest law of 1849 was in force, and before that of 1857 was passed, in which category this contract belongs, no portion of the interest which the debtor may have voluntarily paid shall be deducted from the principal. This provision of that act can have only a prospective operation. Usurious interest paid before its passage was, under the

decisions of this court, a payment *pro tanto* upon the principal, and the debtor could insist on having the payment so applied at any time before the final settlement. This was a right which the legislature cannot take away. It can direct how future payments are to be applied, but the effect of past payments must depend on the laws in force when they were made. We can understand the legislature as intending to apply this portion of the act only to payments thereafter to be made.

There is another portion of this act, however, which will apply to the present case when it is again heard in the Superior Court. We refer to the provision, that, in suits on contracts of the character described, the creditor shall forfeit only the excess of interest above ten per cent where a higher rate than that has been reserved. When this contract was made, ten per cent interest on money loaned was lawful by the law of 1849. That law, however, did not take away the penalty of a three-fold forfeiture given by the law of 1845, as decided in *Kinsey* v. *Nisley*, 23 Ill. 505. The effect of the law of 1857 upon such a contract was not considered in that case, because, although not heard in this court until the January Term, 1860, it had been tried in the court below before the act of 1857 went into effect, and this court merely affirmed the judgment. That case, therefore, furnishes no precedent for the present. Now, although the appellee, when this contract was made, was subject to this forfeiture by way of penalty, yet there is no principle of law better settled than that the legislature can at any time take away the right of action for a penalty. The law recognizes no vested right in a penalty. See *Butler* v. *Palmer*, 1 Hill, 330, and cases there cited. It follows, therefore, that the legislature, in directing by its act of 1867 that ten per cent interest should be allowed on contracts of this character, impaired no vested right. Ten per cent was a legal rate when the contract was made, and a forfeiture of three-fold all the interest reserved, on account of the usurious two per cent, was not a vested right on the part of the debtor, which the legislature could not take away. They expressly took it away by the act of the last session.

This act of the legislature renders it unnecessary to consider what would be the proper rate of interest in this case if the act had not been passed. We must reverse the decree because the Superior Court did not apply the usurious two per cent to the payment of the principal. At another hearing the two per cent will be so applied, and the court will allow Lawrence interest at the rate of ten per cent from the beginning.

It is suggested that the passage of this act of the legislature was procured by counsel in order to meet this particular case, then pending before us. We have no right to assume this, but, even if it were so, that fact would not render the law less obligatory upon us.

The reversal of this decree is not likely to be a benefit to the appellants, and we might for that reason affirm it, but for the fact there is undoubted error in the decree in regard to the usurious two per cent, and it is the right of the appellants and of their securities in the appeal bond to have it reversed.

*Judgment reversed.*