## Mary E. Miller, Appellee, v. William Bross Lloyd et al., Appellants.

### Gen. No. 17,058.

1. ATTORNEY AND CLIENT—*when contract made by attorney with client is void.* Where plaintiff, an attorney, accepts a retainer from four grandsons to represent them in obtaining all the property belonging to them under the will of their grandfather, and while such employment is in full force, enters into a separate employment with three of them to obtain the appointment of a conservator for the fourth to prevent him from obtaining possession of his share of the property recovered, the second contract whereby defendants agreed to pay plaintiff for her services is void on the grounds of public policy.

2. ATTORNEY AND CLIENT—*duty to client.* Attorneys cannot accept employment from adverse litigants at the same time and in the same controversy, though their motives are honest.

3. ATTORNEY AND CLIENT—*contract of employment.* Before the attorney undertakes the business of the client he may contract with reference to his services, because no confidential relation then exists.

4. ATTORNEY AND CLIENT—*where contract of employment is varied.* An agreement made by a client with his counsel after the latter has been employed in a particular business, by which the original contract is varied and greater compensation is secured, is invalid and cannot be enforced.

5. RELEASE—*joint obligation.* Where four brothers are jointly indebted to plaintiff for attorney's fees, a written release to one upon the payment of his share, does not release the others where the evidence shows it was agreed that the total amount due be apportioned among the four.

6. RELEASE—*construction.* A release must be so construed as to carry out the intention of the parties and the intention is to be sought in the language of the instrument itself when read in the light of the circumstances which surrounded the transaction.

7. APPEALS AND ERRORS—*where judgment is affirmed on remittitur.* In an action for attorney's fees where the judgment includes a fee which was improperly allowed, the judgment is affirmed after a remittitur is filed for the amount of such fee.

Appeal from the Circuit Court of Cook county; the HON. JOHN GIBBONS, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Affirmed on remittitur. Opinion originally filed May 8, 1913; vacated and refiled May 29, 1913. Rehearing denied June 12, 1913.

**Statement by the Court.** This is an appeal from a judgment for $32,500 for attorneys' fees. William Bross died testate in 1890, leaving an estate valued at about $2,500,000. He left him surviving as his only heirs at law, his widow, Mary Jane Bross, and his only daughter, Jessie Bross Lloyd. Appellants are three of the four sons of the latter. By the last will and testament of William Bross, deceased, the testator devised practically all of his property to Azariah T. Galt in trust, with directions to pay to his widow $15,000 annually during her lifetime, to his daughter $10,000 annually during her lifetime, and to his sister an annuity of $500; to pay the expenses of the education of his four grandsons, naming appellants and John B. Lloyd; and to pay "to each of my said grandchildren above named, and to any other child or children that may be born to my daughter, Jessie Bross Lloyd, and lives to reach his or her majority" the sum of $5,000 each, on arriving at the age of twenty-one years, $10,000 more at the age of twenty-five, and $35,000 more at the age of thirty years. The eighteenth clause of the will is as follows: "All the remainder and residue of my estate, of every kind, remaining after the death of my said wife and daughter and after the payment of the legacies herein pro-

vided, I give and bequeath to my grandchildren then living, share and share alike.'' Mary Jane Bross died in 1903, and Jessie Bross Lloyd in 1904. The latter left an estate of nearly $900,000, which she devised to her four sons in equal shares.

In 1907, William B. Lloyd, the oldest of the four grandsons of William Bross, deceased, occupied an office in Chicago in the same suite of offices with appellee. Appellee is a lawyer, a graduate of the Michigan State Normal School and of the law department of Lake Forest University. She was admitted to the bar in 1895, and has been in general practice ever since.

It appears that in 1907, all of the provisions of the will of William Bross, deceased, had been complied with, except the payment of the legacies to the two younger sons, and the trustee took the position that under the terms of the will, the period of distribution would not arrive until 1916, when the youngest grandson, John B. Lloyd, would arrive at the age of thirty years. William B. Lloyd requested appellee to give him an opinion as to whether the grandsons could compel an immediate distribution of the estate to them as residuary legatees. Upon receiving a favorable opinion from her, she was authorized to employ other counsel to assist her and to begin proceedings to compel a distribution. With the consent of appellants, she employed Lessing Rosenthal, and on June 15, 1907, the four grandsons signed the following letter:

"Miss Mary E. Miller, and Messrs. Rosenthal and Hamill:

We, the undersigned beneficiaries under the will of William Bross, deceased, request you to bring such proceedings in court as you may deem appropriate to recover for us all property belonging to us or intended for us under said will; to take such action as you may deem expedient against A. T. Galt, the trustee under said will; to generally represent us in the premises

and to follow such course with reference to securing possession of said estate for us as in your judgment shall deem prudent.

(Signed) Henry Demarest Lloyd, William Bross Lloyd, Demarest Lloyd, John Bross Lloyd.''

Shortly after this letter was signed, William B. Lloyd desired to know the amount of the probable fees of appellee and of Rosenthal, and it was then verbally agreed that if they were unsuccessful, the total fees should be not less than $5,000 nor more than $30,000, or, if no receivership was involved, the maximum total fee, in case of nonsuccess, should not exceed $20,000; and that in case of a successful issue to the litigation, the maximum aggregate of fees should not exceed $75,000. Soon after this agreement was made, appellee and the firm of Rosenthal & Hamill agreed upon the following as a basis for a division of such fees as between themselves: ''If fees realized are $30,000 or less, Miss Miller is to have one-third and Rosenthal & Hamill two-thirds. Of every thing over and above $30,000, Miss Miller is to have forty per cent. and Rosenthal & Hamill sixty per cent.'' Appellants were not parties to this last agreement.

In pursuance of this retainer, a bill in equity was filed in the name of the four grandsons as complainants, against the trustee Galt. A trial was had and a decision rendered in favor of the complainants in June, 1908. An interlocutory decree was then entered, finding that said complainants were entitled to immediate distribution of the remainder of the estate in the hands of the trustee, and referring the cause to a master in chancery to take and state an account with the trustee, and to hear evidence and report as to the compensation to be allowed to the trustee and his solicitors. A number of hearings were had before the master, who made a report on March 30, 1909, describing the property of the estate and recommending certain fees to

be allowed to the trustee and his solicitors. A decree directing distribution to be made and the method of distribution was entered on March 31, 1909, and the final report of the trustee, showing the making of such distribution in accordance with the decree, was approved on April 17, 1909.

During the progress of these proceedings, William B. Lloyd repeatedly expressed his dissatisfaction regarding the alleged lack of co-operation between his counsel, resulting as he thought, to his disadvantage. In December, 1908, he authorized appellee to discharge Rosenthal and to request the latter to present his bill for services. She wrote Rosenthal a note to that effect. In her letter, she inclosed a letter from Henry D. Lloyd and Demarest Lloyd to Rosenthal revoking his authority to act for them, and stating, as their reasons for so doing, that differences had arisen between the brothers and that they thought it wise to retain counsel who had not previously represented all of them. This letter also requested Rosenthal to submit a bill "for your share of your fee according to our agreement with you." About the same time, Hiram T. Gilbert was employed by the appellants, and he thereafter worked, in conjunction with appellee, as one of appellants' solicitors. Rosenthal did not present his bill nor withdraw his appearance, and in January, 1909, Henry D. Lloyd, on behalf of appellants, offered Rosenthal $30,000 in full payment for his services. Rosenthal declined to settle without appellee's consent, and the offer was withdrawn. Thereupon, Gilbert was requested to undertake the task of negotiating a settlement of the matter of fees, between appellee and Rosenthal on the one hand, and the four grandsons on the other. Appellee claimed that after considerable negotiation, an agreement was reached in March, 1909, to the effect that the aggregate fees of appellee and Rosenthal should be $65,000, of which each should receive one-half; that this agreement was carried out

so far as Rosenthal was concerned and that he was paid in full; that appellee had already received $2,500 on account, and that as a part of said agreement it was understood that the remaining $30,000 due her should be paid one-fourth by John B. Lloyd, and three-fourths by appellants. There is evidence tending to support this claim of appellee and tending to prove that appellants set apart, in the hands of William B. Lloyd, the sum of $22,500 for the purpose of carrying out their part of said settlement. Appellants claim that they never agreed to pay appellee that sum, but expected to pay her about $15,000 in full for her services.

It further appears from the evidence that in the meantime appellants had received information to the effect that John B. Lloyd, the youngest brother, while attending Harvard University, had become infatuated with a married woman, was spending money lavishly on her, and was otherwise conducting himself in such a manner that the older brothers (appellants) deemed it their duty to take steps to prevent him from personally receiving the control of his share of the estate of William Bross, deceased. It appears that they then employed appellee to assist them in carrying out their wishes in this respect, and that she accepted said employment without any specific agreement as to her compensation, and without withdrawing from her previous engagement to act as solicitor for all the grandsons; that she gave a large amount of her time and did a great deal of work in endeavoring to accomplish the result desired by appellants; that with this end in view she prepared a petition for the appointment of a conservator and filed the same in the probate court of Cook county; that she conducted a voluminous correspondence with appellants, and with their agents and attorneys in Boston and elsewhere, and had many interviews and consultations with appellants and with their counsel in Boston and with the representatives

of John B. Lloyd, all of which eventually resulted in having guardians or trustees appointed in Boston for the estate of John B. Lloyd, and to these trustees his share of the William Bross estate was finally paid.

Upon the trial in the circuit court, plaintiff introduced no evidence as to the value of the services performed by her in connection with the suit brought against A. T. Galt to compel a distribution of the estate of William Bross, deceased, but relied entirely upon the agreement of appellants to pay her three-fourths of $30,000, as above stated. A large volume of evidence was offered as to the value of the extra services rendered by appellee in the John B. Lloyd matter, the witnesses on one side estimating the value of such services to be from $1,800 to $3,500, and those on the other side estimating the value of the same services at from $18,000 to $30,000. It seems evident, from the amount of the verdict, that the jury allowed appellee $10,000 for her services in the John B. Lloyd matter, as distinguished from the services rendered in the Bross estate litigation.

SCOTT, BANCROFT & STEPHENS, for appellants; FRANK H. SCOTT, of counsel.

SAMUEL S. PAGE, for appellee.

MR. JUSTICE FITCH delivered the opinion of the court.

The first question presented by this appeal is whether the appellee, after having accepted a retainer from appellants and John B. Lloyd to represent all of them, with authority to bring such suits and follow such course of action as she might deem expedient "with reference to securing possession" for them of "all property belonging to or intended for" them under the will of their grandfather, could lawfully undertake, while such employment was in full force, a separate employment, the object of which was the ap-

pointment of a conservator for her client, John B. Lloyd, for the purpose of preventing him from obtaining possession of his share of the property recovered. Under the original employment, it was the duty of appellee to use her best efforts on behalf of her client, John B. Lloyd, to "secure possession" for him of his share of the Bross estate. Under the second employment, if valid, it was her duty to use her best efforts to prevent her client, John B. Lloyd, from securing personal possession of his share of the Bross estate. The latter employment was clearly inconsistent with the former, so far as her duty to John B. Lloyd was concerned. Appellee claims that she did not know when she undertook to act for John B. Lloyd, that he was a spendthrift, or otherwise incapable of taking care of his share of the property, but that she learned that such was the fact after she had filed the bill in equity in his behalf. Her own letters show that she at first felt that she ought not to undertake the second employment without withdrawing her appearance in his behalf, but later concluded that it was consistent with her duty, as his counsel, to accept the second employment in order to protect him against the possible consequences of his mental aberration or infatuation. Upon the same theory, her counsel now contends in this court that appellee was not only free to accept an employment which was opposed to the letter and spirit of her previous contract with her client, John B. Lloyd, but that she was fully justified in "practicing deception" to prevent him from acquiring any knowledge of that fact. At the time the second contract was made, John B. Lloyd had not been declared a spendthrift, or distracted, or otherwise incompetent to manage his own affairs, by any court, and his contract with appellee was in full force and effect. After the appointment, in Boston, of guardians for his estate, she collected from them his full share of the agreed compensation for all services rendered by her

in pursuance of *his* contract, whether the same were rendered by her after or before she accepted her second retainer. It might be that, even under these circumstances, she would have been justly entitled to claim a reasonable fee, as against the estate of John B. Lloyd, for extra services rendered by her after she had knowledge of his alleged incapacity, if such services were rendered purely in the due performance of what she considered her duty to him in the premises. This suit, however, was not brought to recover compensation from John B. Lloyd, or his estate, for services rendered *to him or in his behalf,* but was brought against his brothers to recover from them (with other items) the value of extra services rendered in their behalf and *against him,* without his knowledge or consent, and contrary to her prior contract with him. The relation of attorney and client is peculiarly one of trust and confidence. It is the duty of an attorney not only to execute the business intrusted to his care with reasonable skill and diligence, but also to act toward his client with the most scrupulous good faith. He is not compelled to accept a retainer, but if he does accept employment, he is not permitted to accept any adverse retainer. It is his duty to make known to his client any interest he may have, or may acquire during his employment, in the matter about which he is employed, and to disclose all facts that may come to his knowledge affecting his client's interests in any manner. *Staley v. Dodge,* 50 Ill. 43. We are of the opinion that under the circumstances shown by the evidence as above recited, appellee's second contract with appellants, wherein they agreed to pay her for services to be rendered to them and against John B. Lloyd, was void on grounds of public policy.

A case which involved the same principle, though in a different form, is *Strong v. International Investment Union,* 183 Ill. 97. In that case, while the property of the Investment Union (a building and loan as-

sociation) was in the possession of two sets of receivers, Strong, an attorney, was employed by the association for the purpose of accomplishing the discharge of all the receivers and the restoration of the association to the management of its own officers. There was evidence tending to prove that he succeeded in accomplishing that result. During the period of his employment, however, he accepted a retainer and performed services for one set of receivers, and was paid for such services. About the time of the settlement of the accounts of the receivers, Strong presented a petition asking for the allowance of fees for services performed under his contract with the association. His petition was dismissed for want of equity. In affirming that order, the Supreme Court said:

"Attorneys at law cannot thus accept employment from adverse litigants at the same time and in the same controversy. Nor does it matter that the intention and motives of the lawyers are honest, as we fully believe them to have been in the present instance. The rule is a rigid one, and designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests rather than to enforce to their full extent the rights of the interest which he should alone represent." Citing authorities, among them, *McDonald v. Wagner,* 5 Mo. App. 56. "In *McDonald v. Wagner, supra,* the court said: 'Part of the consideration of this note was plainly illegal. An attorney cannot recover for legal services rendered by him both to plaintiff and defendant in the same suit. The plaintiff here discloses a case founded upon a cause of action which the law, from wise motives of public policy, forbids. The intentions of plaintiff were doubtless good; but a lawyer can, under no conceivable circumstances, recover for services rendered in the same suit to parties having opposing interests.' "

In the *Strong* case, *supra,* it further appeared that after the association had been restored to the management of its own officers, its board of directors, by a formal resolution, ratified all that had been done by Strong in behalf of the association in the litigation against it, and it was urged that such ratification, with full knowledge of the inconsistent employment undertaken by Strong, amounted to a waiver of all defense on that score. The court held, however, that such a contract could not be ratified, nor such a defense waived, for the reason that it is against public policy to permit an attorney to accept any employment inconsistent with his duty to his client. As to the original contract in this case, the liability of appellants to appellee is not affected by this rule, for the second employment is inconsistent with the first only so far as the rights of John B. Lloyd are concerned. The second contract, however, stands upon a different footing. It is absolutely void under the principle announced in the *Strong* case, *supra,* and cannot be enforced by appellee. It follows that the court erred in admitting any evidence as to the value of services performed by appellee under that contract in and about the so-called "John B. Lloyd matter."

It is also urged that it is not shown, by a preponderance of the evidence, that appellants ever agreed to pay appellee $22,500 for her services in the litigation. This is a question of fact, and the verdict of the jury upon that question should not be disturbed unless it is clearly contrary to the weight of the evidence.

On this point, Judge Gilbert testified that after several interviews with Rosenthal, with appellants, with Porter and Sprout (John B. Lloyd's attorneys), and with appellee, he told appellee that the matter of fees would be settled upon the basis that Rosenthal should be paid a fee of $32,500, plus his expense account amounting to about $1,100, and that as appellee had already received $2,500 on account of fees, she would

be paid $30,000, which "would put her on an equal footing with him, and she said she would be satisfied with that." He further testified: "Subsequently, when the three defendants were in my office, I told them what the arrangement was. No objection was made to it. I believe William B. Lloyd said that he did not like Rosenthal's expense account. I told him   *   *   *   that we wanted to get the matter settled up, and the matter was trifling, and they ought not to bother about that." It also appears that Rosenthal then prepared a formal contract in eight parts, to be signed by all, reciting that $32,500 should be paid Rosenthal & Hamill, and $30,000 to appellee for their respective services, that the former should also be paid $1,119.35 expenses, and that each of the four Lloyds should pay $8,125 to Rosenthal & Hamill and $7,500 to appellee, in full for their services. This document was not signed, however. Judge Gilbert testified that he objected to some of the recitals in the draft as prepared by Rosenthal, that he stated his objections to appellants, who also objected to it, and that he then said it was unnecessary to sign any such paper, that "we all understood what the settlement was   *   *   *   and instead of drawing an elaborate contract to be signed by all of them, I would draw proper receipts and releases, and that was all that was said about it at that time;" and that he then prepared such receipts and releases.

William B. Lloyd testified that he refused to sign the draft of agreement prepared by Rosenthal because he thought the amount to be paid to appellee was "too much for her, even if her extra services in the John Bross Lloyd matter were considered," that Judge Gilbert then said: "Well, it is not necessary to sign it, but we all understand the agreement, don't we?", to which he replied, "No, we do not." He admitted, however, that previous to that time, Judge Gilbert had "asked us whether we would be willing to settle for $62,500, and Dr. Lloyd said yes, and I didn't say anything."

Dr. Henry D. Lloyd testified that he and Sprout went to see appellee, and "said we would pay as high as $60,000, and I stated that I did not care how she and Mr. Rosenthal divided that amount;" that later, when appellee and appellants were discussing the matter in Judge Gilbert's office, "Judge Gilbert said Rosenthal would accept $32,500 and Miss Miller would accept $30,000," to which William B. Lloyd replied (after appellee, at his request, had stepped out of the room) that he did not want to settle with her on that basis. On cross-examination, however, Dr. Lloyd admitted that in October, 1909, he testified, upon the trial of a suit brought against appellants by Judge Gilbert, that the result of the negotiations carried on by Judge Gilbert in appellants' behalf was, "that Sprout on his side, and we three brothers, agreed upon a total payment, on account of these fees, of $62,500, together with Rosenthal's expense account, and that Sprout and Flint, as trustees, should pay one-quarter and we three brothers the other three-quarters;" and that in that suit, he had also testified that: "After the Bross estate was distributed, William Bross Lloyd, Demarest Lloyd and I talked over the question of fees. To the best of my knowledge and belief, we agreed among ourselves we would pay Miss Miller $22,500 in addition to what she would get from Sprout and Flint. We considered that the services were hardly worth that, but the idea was, rather than to have any trouble, inasmuch as we had agreed to that, we would pay it." Demarest Lloyd did not testify on this subject.

Appellants do not deny that Judge Gilbert was authorized by them to conduct all these negotiations on their behalf. It clearly appears that the agreement which resulted from such negotiations has been carried out in exact conformity with Judge Gilbert's version thereof up to the point of the payment of appellee's fees. The trustees of John B. Lloyd, who participated in the negotiations, paid appellee, as her share of the

agreed fees, one-fourth of $30,000. It is apparent, from this fact, that the representatives of John B. Lloyd understood that an agreement had been made that appellants should pay to appellee the remaining three-fourths of an agreed fee of $30,000. The fact, too, that appellant set apart $22,500 in the hands of William B. Lloyd, which sum, according to the evidence of Henry D. Lloyd, appellants agreed "among ourselves, but not with Miss Miller" to pay to appellee "for all her services in both the will and the John B. Lloyd matter, rather than have any controversy with Miss Miller," is a significant circumstance. There is no evidence that any amount was ever mentioned during the negotiations, as to the value of her services in the John B. Lloyd matter. The fact, therefore, that appellants, after these negotiations, set apart the specific sum of $22,500 to be paid to her "rather than to have any controversy with her," tends to prove that they understood that amount to be the amount agreed upon to be paid her, in settlement of that controversy. Under these circumstances, we do not think it can fairly be held that the verdict is clearly contrary to the weight of the evidence on this point.

The rule is also invoked that in transactions between attorney and client, the burden is on the attorney, not only to show that a contract was made as alleged, but also to show that the contract, as made, was fair and equitable, and was entered into by the client after being fully informed of his rights. Upon this principle it is insisted that it was incumbent upon appellee to prove that $22,500 was a reasonable fee and that appellants were fully advised as to what fees were reasonable and customary in such cases. The rule is hardly as broad as is claimed by appellants' counsel. In *Elmore v. Johnson,* 143 Ill. 513, it is said: "Before the attorney undertakes the business of the client, he may contract with reference to his services, because no confidential relation then exists and the parties deal

with each other at arm's length. The same is true in regard to dealings which take place after the relation has been dissolved.'' The rule is thus stated in a quotation given in that case from *Lecatt v. Sallee,* 3 Port. (Ala.) 115: ''An agreement made by a client with his counsel after the latter has been employed in a particular business, *by which the original contract is varied and greater compensation is secured to the counsel than may have been agreed upon,* when he was first retained, is invalid and cannot be enforced.''

In this case it appears that at the beginning of the employment of appellee, an agreement was made by which the fees were made to depend, to some extent, upon success or failure and a maximum of $75,000 was agreed on for the joint services of Rosenthal and appellee in case of a successful result. It also appears that the settlement in question was agreed on after practically all of the work and services of Rosenthal and appellee in the will litigation had been performed. The original contract was fully executed on their part and nothing remained to be done but to agree upon the amount due and pay over the money. As above stated, the preliminary decree fixing the rights of the parties, with an order of reference merely as to the accounts of the trustee and his compensation and that of his solicitors, was entered in June, 1908. The master's report as to those matters was filed March 30, 1909, and a final decree entered March 31, 1909. The draft of the settlement prepared by Rosenthal bears the date March 29, 1909, and the receipts executed by Rosenthal & Hamill and by appellee for the money which was paid in pursuance of the settlement are dated April 1, 1909. The total of the fees thus agreed upon, after the work was done, was not greater, but was less than the maximum fee agreed upon at the beginning of the employment. Appellants were not parties to the arrangement between Rosenthal and appellee as to a division of the fees when earned and were not con-

cerned in that matter. It is clear, from the evidence, that appellants did not rely upon either appellee or Rosenthal for advice during the negotiations for a settlement of the question of fees. They dealt with each other upon that matter entirely at arm's length. Throughout the negotiations, appellants had the benefit of the independent advice and assistance of Judge Gilbert, and there is no intimation in the record that he did not fully perform his duty in that regard. We are of the opinion that the facts shown do not bring this case within the operation of the rule above quoted.

It is further urged that the joint obligation of the four Lloyd brothers was wholly released and discharged when appellee executed a formal written release to John B. Lloyd upon the payment by him to appellee of $7,500. The evidence shows, however, that as a part of the settlement, it was agreed that the total amount due to appellee was apportioned between the four brothers and the amounts due respectively from John B. Lloyd and from appellants were agreed on, and that appellee acquiesced in that agreement. By this agreement, the former joint liability was, by consent, changed to a liability on the part of John B. Lloyd to pay one-fourth of the total sum, and on the part of appellants to pay three-fourths thereof. But even if this were not true, the release to John B. Lloyd cannot be given the effect claimed, for it must be read and construed in the light of the circumstances under which it was given. "A release, like every other written instrument, must be so construed as to carry out the intention of the parties. This intention is to be sought in the language of the instrument itself when read in the light of the circumstances which surrounded the transaction. * * * If A receives a contract or other instrument from B, knowing that it was designed by B to bear a particular interpretation and to be used only for a specific purpose, then A has no right to give it a different interpretation, or to use it for a different

purpose, though such new purpose may be consistent with the language of the instrument. To permit A to pervert the instrument from the purpose for which he knew it was intended by B, would be to permit him to commit a fraud. This rule is founded upon the plainest dictates of natural justice." *Parmalee v. Lawrence*, 44 Ill. 405, 410.

In the opinion originally filed in this case, the judgment of the circuit court was reversed and the cause remanded on account of the error of the court in admitting evidence of the value of services performed by appellee in the John B. Lloyd matter. On petition for rehearing it was suggested that this error could be cured by a remittitur of $10,000, and we were asked to give appellee the opportunity of filing such a remittitur. In the briefs originally filed by appellee's counsel, it was insisted that the jury may have allowed interest on the item of $22,500, in which case the amount allowed for services in the John B. Lloyd matter would not exceed $8,550. Appellants' counsel replied to this by pointing out that no instructions were given to the jury regarding the allowance of interest, which seems to be true. In the petition for rehearing, appellee's counsel now states that he "believes it is clear beyond a reasonable doubt" that the jury allowed $10,000 for services in the John B. Lloyd matter. We have also reached the same conclusion and are disposed to give appellee the opportunity she seeks, especially in view of the large expense and time involved in a new trial. Therefore, the judgment heretofore entered herein will be vacated, the original opinion recalled and a new judgment will be entered as follows: If, within ten days from the date of the filing of this opinion, appellee shall file herein a remittitur of $10,000, the judgment of the circuit court will be affirmed for $22,500; otherwise, the judgment will be reversed and the cause remanded for a new trial.

*Affirmed on remittitur.*