Delbert Hulke and Stuart Hulke, a minor, by Delbert Hulke, His father and next friend, Plaintiffs-Appellees, v. International Manufacturing Company, et al., Defendants, Skelly Oil Company, Defendant-Appellant.

Gen. No. 10,950.

Second District.

May 8, 1957.

Rehearing denied June 3, 1957.

Released for publication June 5, 1957.

6

8

12

Putnam, Johnson & Alschuler, of Aurora (Sam Alschuler, Ralph C. Putnam, Jr., Edward J. McWethy and Charles L. Bacon, all of Aurora, and Ronald L. Somerville, of counsel) for appellant.

O'Brien, Burnell & Puckett, of Aurora (William C. O'Brien, Wilson D. Burnell, Donald L. Puckett, Joseph H. Barnett and Henry D. Casey, all of Aurora, of counsel) for appellees.

JUSTICE EOVALDI delivered the opinion of the court.

This action was brought to recover damages for severe personal injuries received by plaintiffs, Delbert Hulke, and for minor personal injuries received by his son, Stuart Hulke, as a result of an explosion of liquid petroleum gas manufactured by defendant Skelly Oil Company under the trade name of "Skelgas."

The defendants were: International Manufacturing Company (dismissed before trial), Foundation Equipment Corporation of Illinois, Skelly Oil Company, and five individual defendants, constituting a partnership, doing business as "Bunge's" (for convenience sometimes referred to hereafter as a single defendant). The case took almost a month to try and the record consists of more than 4,300 pages.

The gist of the action is negligence of all parties named as defendants which proximately caused the injuries to plaintiffs. The injuries were received in connection with a propane gas explosion which occurred when plaintiff, Delbert Hulke, sought to re-ignite a salamander on a construction job of which he was foreman. Different charges of negligence were made against each of the defendants. The charges against defendant Skelly Oil Company, appellant herein (hereafter referred to as Skelly,) were to the effect that it had negligently failed to odorize or sufficiently odorize, the propane gas and that it was liable as principal or employer for the negligent acts, if any, of the retailer of the gas, the defendant "Bunge's," its alleged agent or employee. The jury returned a general verdict for the plaintiff, Delbert Hulke, in the amount of $300,000 jointly against the three defendants, and for the minor plaintiff, Stuart Hulke, in the amount of $1,000, upon which the court rendered the judgment from which this appeal is taken. Only defendant Skelly appeals.

14

The theory of the plaintiffs is that the defendant, Bunge, and the defendant, Skelly, jointly entered into an agreement whereby Bunge became the agent for Skelly in the distribution of gas, and the allegation of the complaint is that Skelly negligently failed to odorize propane gas which Bunge sold its customers. Plaintiffs contend that both judgments should be affirmed because:

1. Negligence, contributory negligence and proximate cause, all inferences to be drawn from the evidence, and the amount of damages are questions of fact for the jury.

2. Whether or not Bunge's were the agents of defendant Skelly was a question of fact for the jury.

3. Defendant Skelly concedes that it was negligence to connect "Skelgas" to the portable liquid gas fired heater in this case without using an automatic shut-off device. Defendant Skelly is liable for this negligence because (a) Bunge's were agents of defendant Skelly, (b) defendant Skelly negligently permitted Bunge's, who were untrained and incompetent, to distribute "Skelgas", and (c) defendant Skelly had a nondelegable duty to ascertain that an automatic safety shut-off device was used.

4. Plaintiffs have a right to collect all or any part of their judgments from all or any one of defendants in whatever proportion plaintiffs elect, so long as plaintiffs receive only one full compensation for their injuries. The payments made by defendants Bunge's and Foundation and credited on plaintiffs' judgments did not satisfy said judgments and no releases were given.

5. Defendant Skelly had a fair trial. The verdicts were what reasonable persons would expect from the evidence in this case.

A question raised by this appeal on the pleadings arises out of the court's striking special affirmative

15

matters pleaded in defense by Skelly. These matters had to do with the alleged fact that plaintiff, Delbert Hulke, his employer, Sevrin Swaback, and Skelly, were at the time of the accident under the Illinois Workmen's Compensation Act, said accident occurring at a time when the first paragraph of section 5(b) of the 1951 Act [Ill. Rev. Stats. 1951, ch. 48, § 138.5] was invalid and before it was replaced by the 1953 Amendment. Skelly alleged that Swaback paid the plaintiff Delbert Hulke's medical expenses, plus other compensation payments, to an amount approximating $60,000, and to the extent of such payments the damages, if any, of plaintiff Delbert Hulke should have been reduced and mitigated.

After all defendants had filed various post judgment motions, but before argument thereon, the defendants doing business as "Bunge's" effected a settlement with the plaintiffs for the sum of $93,166.67 to Delbert Hulke and $333.33 to Stuart Hulke. The plaintiffs issued quit claim deeds, indemnity bonds and other documents to "Bunge's," which documents Skelly claims constituted full releases or accords and satisfactions and thereby released all of the alleged joint tort feasors, including Skelly. Thereafter, subsequent to decision by the court of the various post judgment motions, the defendant, Foundation Equipment Corporation, effected a settlement with the plaintiffs, paying to Delbert Hulke the sum of $63,200 and to Stuart Hulke, $300. Documents of like effect to the above were issued by the plaintiffs to defendant, Foundation Equipment Corporation. Skelly has filed a Motion with this court requesting that the said settlement be held to be a release, or an accord and satisfaction, thus fully releasing Skelly from further liability as an alleged joint tort feasor. The motion was ordered by this court to be taken with the case.

Defendant Skelly's theory is as follows: That Skelly was released by the issuance of releases or by the en-

tering into of accords and satisfactions by the other defendants as suggested above; that Skelly was guilty of no negligence proximately causing plaintiffs' injuries; that the propane gas was sufficiently odorized, as shown by the uncontradicted, uncontroverted and positive physical and scientific proof in the record and that the presence of odor was decisive in this matter; that the plaintiffs have failed to prove that "Bunge's" was Skelly's agent or employee for the purposes concerning which "Bunge's" were claimed to be negligent; that plaintiff, Delbert Hulke, was guilty of contributory negligence as a matter of law and failed to sustain the burden of proving that he was exercising ordinary care for his own safety at the time of the accident in question; that the trial court admitted improper evidence and excluded proper evidence, and certain conduct of plaintiffs' counsel was prejudicial error; that the court gave erroneous instructions and refused to give proper instructions to the jury, and the court erroneously refused to submit to the jury the special interrogatories submitted by Skelly; that the court erred in striking Skelly's special defenses and denying Skelly's motion to make Swaback a party to the action; that the verdict was grossly excessive; that the verdict was against the manifest weight of the evidence; that the court erred in denying Skelly's motion for judgment notwithstanding the verdicts in favor of each plaintiff; and that the court erred in denying Skelly's motion for a new trial against each plaintiff.

The facts were that "Bunge's" owned and operated a general appliance store and service station in Elgin and sold "Skelgas" at retail; that the Foundation Equipment Corporation sold a portable heater to a man by the name of Swaback, who was a general contractor in Elgin. Swaback was engaged in erecting a church in Elgin and purchased this portable heater or salamander. Plaintiff, Delbert Hulke, was 29 years of age and was construction foreman on the church job,

17

being employed by Swaback. Plaintiff testified that Robert Bremmer, in December, 1952 came to the Brethren Church where he had been working for approximately 1 year, and asked him to "come out and help him unload something out of his car; it was a gas salamander." Plaintiff helped him to take it out of his trunk and set it on the church floor. "It was not packaged. The only conversation I had with Mr. Bremmer was when I saw the salamander, I said, 'What does Swaback want with this thing?' He made the statement, 'This is for the Schneider job.'" . . . "It was used the first time when the plasterers were working at the church. * * * I lit the machine during the time I was at the Brethren Church in the same fashion that I had been shown by the man from Bunge's. We later went to another project on South Grove Avenue in Elgin. That was the Schneider job, and consisted of putting in an addition on to the bowling alley, a basement and 2 stories. I believe we went there approximately the middle of January or first of February. The salamander was not moved to the Schneider job from the Brethren Church when I was transferred, but it was moved prior to the explosion by several laborers. I did not have anything to do with ordering it to be moved. Some other cylinders of gas were brought to the Schneider job, and they were secured from Bunge's. I did not have anything to do with ordering those cylinders of gas. The salamander was put into the basement of the Schneider job. I did not have anything to do with putting it into the basement, or with putting the cylinders of gas into the basement; the laborers did it." On March 1, 1953, Hulke accompanied by his son, Stuart, went to the basement of the Schneider Bowling Alley where the salamander had been installed for the purpose of keeping the newly poured concrete wall from freezing, and entered the basement and ascertained that the salamander was not

18

lit. He opened the valve of the salamander and attempted to relight it, but it did not light. Thereupon he cracked the valve open and an explosion occurred and Hulke was severely burned and his son, suffered some injuries. Until a short time prior to the explosion plaintiff, Delbert Hulke, and his employer, Sevrin Swaback, had been using oil fired salamanders in construction work. A short time prior to the explosion defendant Foundation had sold and delivered a Chinook Wind Liquid Gas Fired Salamander Space Heater to Swaback. At the time of the sale defendant Foundation represented the gas fired salamander as safe, economical and clean. It is undisputed that as sold the Chinook Wind Liquid Gas Fired Salamander Space Heater was not equipped with an automatic safety shut-off device. Neither plaintiff, Delbert Hulke, nor his employer Swaback knew anything about liquid gas fired salamander space heaters. Defendant Foundation told Swaback to purchase liquid petroleum gas from defendant Bunge's. Swaback went to Bunge's to purchase liquid petroleum gas and was sold "Skelgas," a commodity of defendant Skelly. At that time defendant Bunge's asked Swaback if he had the necessary controls. Swaback said he did not know; so defendant Bunge's agreed to provide the necessary controls and to deliver, and install and take up the "Skelgas." Defendant Bunge's employee Miller delivered and installed the cylinder of "Skelgas." It is undisputed that Miller installed the "Skelgas" without using an automatic safety shut-off device, but at the same time Miller told Swaback that he had all controls necessary. At the time Miller delivered and connected up the "Skelgas," Swaback asked Miller to show plaintiff, Delbert Hulke, how to light the space heater and change a cylinder. Miller showed plaintiff, Delbert Hulke, how to light the space heater and change a cylinder, but Miller did not instruct either plaintiff,

19

Delbert Hulke, or his employer Swaback on saftey precautions in using the "Skelgas." Plaintiff, Delbert Hulke, testified that Miller told him there was nothing to worry about; it was absolutely safe. Miller denies making such statement. Miller further testified that he told Hulke and Swaback not to leave the salamander unattended. The salamander space heater was used by plaintiff, Delbert Hulke, and his employer Swaback without undue incident until the time of the explosion. On the date of the explosion the salamander space heater fired by "Skelgas" was being used in a basement stairwell to provide heat to keep concrete from freezing. Just prior to the explosion plaintiff, Delbert Hulke, had entered the basement to check the salamander. He found the flame was out, but he smelled no odor of gas. He saw an eight inch frost line on the cylinder indicating to him that liquid gas remained in the cylinder; so he attempted to relight the space heater in the same manner as he had been shown by the defendant Bunge's employee Miller, and the explosion occurred.

On the second day after trial had commenced, and during voir dire examination of a prospective juror, defendant Skelly by oral motion suggested making Sevrin Swaback a party defendant. Previously defendant had plead these special affirmative matters in defense. Plaintiffs contended that Sevrin Swaback was not a proper party and that the motion to make him a party should have been denied, even if made in apt time. These special affirmative matters had been previously stricken by the court.

 Only one cause of action accrued against defendant Skelly as a result of the injuries received by plaintiff, Delbert Hulke, and this cause of action belonged to plaintiff. Workmen's compensation payments to plaintiff by his employer, Sevrin Swaback did not create a separate and distinct cause of action in favor of Sevrin Swaback against defendant Skelly.

All rights, if any, of Sevrin Swaback originated by subrogation to part of the cause of action of plaintiff against defendant Skelly. Being to only part of the cause of action of plaintiff, Delbert Hulke, the rights, if any, of his employer, Sevrin Swaback, to reimbursement by reason of subrogation are more in the nature of a lien on the recovery made by plaintiff, Delbert Hulke. Grasse v. Dealer's Transport Co., 412 Ill. 179, 201; Manion v. Chicago, R. I. & P. R. Co., 2 Ill.App.2d 191, 197 to 203; Johnson v. Turner, 319 Ill. App. 265, 278; Geneva Const. Co. v. Martin Trans. Co., 4 Ill. 2d 273, 283. Before Sevrin Swaback acquires any rights by subrogation in the cause of action of plaintiff, Delbert Hulke, against defendant Skelly, Sevrin Swaback must not have been guilty of negligence. Manion v. Chicago, R. I. & P. R. Co., supra; Grasse v. Dealer's Transport Co., supra; Geneva Const. Co. v. Martin Trans. Co., supra. Defendant Skelly's Fourth Defense alleged that Sevrin Swaback was guilty of negligence. If these allegations were true, then Sevrin Swaback acquired no rights by subrogation in the cause of action of plaintiff, Delbert Hulke, against defendant Skelly. Swaback could not have any interest which could be affected by the outcome of the suit. His negligence, if any, is not a defense to plaintiff, Delbert Hulke's cause of action against defendant Skelly and this Fourth Amended Additional Defense was properly stricken. It would be highly improper to introduce into plaintiff, Delbert Hulke's suit, the collateral issue of whether or not his employer Swaback was guilty of negligence since this issue could in no way affect the liability of defendant Skelly to plaintiff.

Defendant Skelly's Second Defense seeks to reduce the amount of damages which plaintiff, Delbert Hulke, can recover from defendant Skelly. This reduction was not proper in the trial of this case, for if Swaback were not guilty of negligence, plaintiff, Delbert Hulke, would be required to reimburse Swaback

for the amount of compensation paid. Grasse v. Dealer's Transport Co., supra; Johnson v. Turner, supra, at 278. In Grasse v. Dealer's Transport Co., supra, at page 201, the court said:

"The employee, in turn, would not be entitled, as defendant suggests, to retain both compensation from his employer and damages against the third party, but would, under common-law principles be required to reimburse his employer for the amount paid him from the sum recovered from the third party."

 Defendant Skelly's Third Defense seeks to split the cause of action. This cannot be done. A single cause of action cannot be split or divided so as to be made the subject of different actions. 1 Corpus Juris, p. 1106, Actions, Section 276. As was said in 1 Am. Jur., Actions, Section 96, pages 480–481:

"The law does not permit the owner of a single or entire cause of action or an entire or indivisible demand, without the consent of the person against whom the cause or demand exists, to divide or split that cause or demand so as to make it the subject of several actions. The whole cause must be determined in one action. . . . The rule is founded upon the plainest and most substantial justice,—namely, that litigation should have an end and that no person should be unnecessarily harassed with a multiplicity of suits."

The plaintiff Delbert Hulke's cause of action remains the same, and he has the capacity to sue for the entire amount of damages sustained by him. If Swaback were not guilty of negligence, plaintiff, Delbert Hulke, must reimburse him for the amount of compensation paid; if Swaback were guilty of negligence he acquired no rights by subrogation in the cause of action of plaintiff, Delbert Hulke. In Johnson v. Turner, supra, at 278, this court in discussing a similar problem said:

"Under the above holdings, it is manifest that what, if anything, an employer can recover under section 29,

22

comes out of what the employee recovers from the third party. The amount the employee recovers from the third party is measured by the liability of the third party to him, regardless of whether his employer is or is not entitled to reimbursement or indemnification out of the money. It is of no consequence to the third party whether the employer receives any part of it or not. The third party's liability is not affected thereby, and the matter of whether the employer is reimbursed is a matter wholly between him and the employee."

The court did not err in its rulings on the motions and in striking the special affirmative matters in defense.

On June 16, 1955 the jury returned a verdict finding defendant Skelly, with the two other defendants, guilty of negligence and assessing $300,000 damages for the plaintiff Delbert Hulke, and $1,000 damages for the plaintiff, Stuart Hulke. On July 1, 1955 judgment was entered on each verdict. Thereafter all defendants filed motions for judgment notwithstanding the verdict and for a new trial. On August 4, 1955, while such motions were still pending, defendant Bunge's paid $93,166.67 on the judgment of plaintiff Delbert Hulke, and $333.33 on the judgment of plaintiff Stuart Hulke. On August 23, 1955 motions of all defendants for judgment notwithstanding the verdict were denied; and on December 19, 1955 defendants' motions for a new trial were denied. Thereafter on January 19, 1956, after notice of appeal had been filed, defendant Foundation paid $63,200 on the judgment of the plaintiff, Delbert Hulke, and $300 on the judgment of the plaintiff, Stuart Hulke.

At the time of the respective payments on each judgment by defendants Bunge's and Foundation, similar receipts for the amounts of the payments to be credited on the judgment, unexecuted agreements entitled "Covenants Not to Sue" were attached to the indemnity

bonds, and indemnity bonds and quit claim deeds were delivered to each defendant by each plaintiff. It is these instruments which defendant Skelly, contends should be construed either as a release, or as an accord and satisfaction, so as to discharge defendant, Skelly, of its obligation to pay the remainder of the judgment and interest of the plaintiffs.

When the jury returned a verdict of $300,-000 for the plaintiff, Delbert Hulke, and $1,000 for plaintiff, Stuart Hulke, their unliquidated claims for damages for personal injuries then became liquidated by and merged in the verdict and judgments for that amount. It has many times been said that although there is no contribution between joint wrongdoers, a plaintiff has the election to collect all or any part of his claim from one or more of them so long as plaintiff receives only one full compensation for his injuries. Aldridge v. Morris, 337 Ill. App. 369; City of Chicago v. Babcock, 143 Ill. 358; Vandalia R. R. Co. v. Nordhaus, 161 Ill. App. 110. The plaintiffs had the right to collect such sums as they desired from defendant Bunge's and defendant Foundation without jeopardizing their right to collect the remainder from defendant Skelly. Illinois recognizes a distinction between a release, or an accord and satisfaction, and a covenant not to sue. A release, or an accord and satisfaction, generally extinguishes or discharges the cause of action, while a covenant not to sue does not affect the cause of action but only the right to sue thereon. A release, or an accord and satisfaction, are generally considered a bar to further action while a covenant not to sue is not so considered. A release of, or an accord and satisfaction with, one joint tort feasor is generally considered a discharge of all joint tort feasors, while a covenant not to sue is not so considered. Whether or not a document is construed as a release, an accord and satisfaction, or a covenant not to sue depends upon the words used, the amount paid, the

24

substance of the agreement and the intention of the parties. The underlying principle in construing whether or not a document is or is not a release, an accord and satisfaction, or a covenant not to sue is the basic one that a person is entitled to only one full compensation for his injuries. The unexecuted instrument attached to the bond executed by Delbert Hulke to the Bunge's, is as follows:

"COVENANT NOT TO SUE

KNOW ALL MEN BY THESE PRESENTS, that the undersigend, DELBERT HULKE, for and in consideration of the sum of Ninety-three Thousand One Hunderd Sixty-six and $^{67}/_{100}$ Dollars ($93,166.67) in hand paid by Alfred Spellmeyer, Joseph Hines, Otto Deter and Arthur Bunge, individually and as a partnership doing business as "Bunge's," and St. Paul Mercury Indemnity Company, the receipt and sufficiency whereof being hereby acknowledged, does hereby now and forever covenant and agree not to sue Alfred Spellmeyer, Joseph Hines, Otto Deter and Arthur Bunge, individually and as a partnership doing business as "Bunge's," and St. Paul Mercury Indemnity Company, and to refrain forever from instituting, pressing, collecting or in any way aiding or proceeding upon any and all claims, judgments, debts, costs of action, suits and proceedings of any kind at law or in equity which the undersigned ever had, now has or may have against any of the aforementioned covenantees or their legal representatives, successors or assigns, arising out of a certain explosion which occurred on March 1, 1953 on the premises known as Schneider Brothers Recreation located at 105 South Grove Street, Elgin, Kane County, Illinois, in which explosion Delbert Hulke was injured.

It is hereby expressly understood and agreed that the consideration of $93,166.67 has been received by the undersigned in full payment for this covenant not

25

to sue, notwithstanding any injuries or damages sustained, whether known or unknown.

It is hereby expressly understood and agreed that this instrument is not intended as a release or discharge of nor as an accord or satisfaction with any person whomsoever, but only as a covenant not to sue and to the effect that each covenantee hereby purchases peace and is hereby given peace upon any and all claims and matters whatsoever which have been or may be made against covenantees by the undersigned; and that covenantees in making payment of said consideration for this covenant have done so solely to obtain such peace and do not thereby admit any liability on account of any of said claims or matters but expressly deny all of such liability whatsoever.

It is further expressly understood and agreed that the undersigned hereby expressly reserves the right to proceed against or sue any other person or persons against whom he may have or assert any claim on account of damages arising out of the above described explosion.

It is further expressly understood and agreed that nothing herein contained shall in any way tend to release or discharge or shall in any way be construed as releasing or discharging International Manufacturing Company, Foundation Equipment Corporation and Skelly Oil Company, or any other person or persons, against whom the undersigned may have or assert any claim on account of damages arising out of the above described explosion.

The undersigned expressly reserves the right to proceed against International Manufacturing Company, Foundation Equipment Corporation, Skelly Oil Company, and any other person or persons against whom he may have or assert any claim on account of damages arising out of the above described explosion."

Of like effect is the unexecuted agreement entitled "Covenant Not To Sue" attached to the bond executed by the other plaintiff. The agreements executed by plaintiffs to Foundation are of like effect.

The words "release," "discharge," "full settlement" or "satisfaction" do not appear anywhere in said documents except wherein it is stated that "this instrument is not intended as a release or discharge of nor as an accord or satisfaction with any person whomsoever, . . ." and except wherein it is mentioned "that nothing herein contained shall in any way be construed as releasing or discharging . . . ."

Appellant relies on cited cases, including the cases of Petroyeanis v. Pirola, 205 Ill. App. 310 (First District) and Rice v. Webster, 18 Ill. 331, to the effect that the settlement between plaintiffs and defendants, Bunge's and Foundation, was a release or satisfaction, thus satisfying the liability, if any, of all alleged tort feasors; and argues that this court should decide the motion based on the Foundation settlement, (which was entered into after notice of appeal was filed in this cause) in favor of the defendant Skelly.

The Petroyeanis case was mentioned in the later case of Van Meter v. Gurney, 251 Ill. App. 184, in which the First District Appellate Court again had occasion to construe an instrument entitled "Covenant Not To Sue." The latter case held that an agreement entered into between a judgment creditor and one of two joint judgment debtors releasing such debtor from liabilty under the judgment, in consideration of the payment of a part thereof, but preserving all rights thereunder against the other debtor as to the balance of the judgment does not operate as a satisfaction of the judgment and release of such other judgment debtor, and this was true though the judgment was recovered in a tort action. In the Van Meter case, the court said, at pages 186–187:

27

"Confining our consideration to the effect of such an agreement on joint judgment debtors and not as to claims against joint tort-feasors, we are of the opinion that the decided weight of authority favors the enforcement of the agreement of the parties if the language is clear and unambiguous. It clearly appears from the written instrument that it was the intention of the parties thereto to release only one of the judgment debtors and to reserve the right to proceed to collect the balance of the judgment from the other judgment debtor. The courts must give effect to such intention. It has been so held in Parmelee v. Lawrence, 44 Ill. 405; Nickerson v. Suplee, 174 Ill. App. 136 (certiorari denied); Wallace v. Armstrong, 236 Ill. App. 457; People ex rel. Lamoreaux v. City of Chicago, 243 Ill. App. 623.

"It is argued that, because the judgment arises out of an action in tort, the rule as to a release of one joint tort-feasor must prevail. It does not follow. The claim in tort is merged into the judgment which is a debt, and where there is an agreement to release one joint debtor, the creditor reserving his right against the other, such agreements have been almost universally construed so as to effectuate the intention of the parties. 34 Cyc. 1035. It requires some artificiality in reasoning to avoid giving effect to the intention of the parties in the instant case, where this intention is expressed as clearly as language is capable of expression.

"We do not consider Rice v. Webster, 18 Ill. 331, or Petroyeanis v. Pirola, 205 Ill. App. 310, as controlling. The former case was in effect overruled in Parmelee v. Lawrence, 44 Ill. 405. The Petroyeanis case was a creditor's bill; the opinion gives a very meager statement as to the agreement said to be a covenant not to sue and the decision did not necessarily turn upon the instant point. In any event, the decided weight of authority is as above indicated."

28

In the case of Parmelee v. Lawrence, 44 Ill. 405 at 413–414, the court said:

"On the question as to the effect of this release, counsel for appellants have cited the cases of Benjamin v. McCormick, 4 Gilm. 536, and Rice v. Webster, 18 Ill. 331. It will be observed from what we have already said that there are facts in this case which widely distinguish it from either of those. We would further add that the weight of the modern authorities is against these cases, and in favor of the more reasonable rule, that where the release of one of several obligors shows upon its face, and in connection with the surrounding circumstances, that it was the intention of the parties not to release the co-obligors, such intention, as in the case of other written contracts, shall be carried out, and to that end the instrument shall be construed as a covenant not to sue. Parsons, in his work on contracts, volume 1, page 24, uses the following language: 'But though the word "release" be used, even under seal, yet if the parties (the instrument being considered as a whole, and in connection with all the circumstances of the case and the relations of the parties) cannot reasonably be supposed to have intended a release, it will be construed as only an agreement not to charge the person or party to whom the release is given, and will not be permitted to have the effect of a technical release; for a general covenant not to sue is not of itself a release of the covenantee, but is so construed by the law to avoid circuity of action; and a covenant not to sue one of many who are jointly indebted does not discharge one who is a joint debtor to the covenantor, nor in any way affect his obligation.' This rule is substantially so laid down in the following cases: North v. Wakefield, 66 Eng. C.L. 536; Willis v. DeCastro, 93 id. 215; Sully v. Forbes, 2 B. & B. 46; Kirby v. Taylor, 6 Johns, Ch. 242; Clagett v. Salmon, 5 Gill & Johns, 351; Lysaght v. Phillips, 5 Duer, 116; Wiggin v. Tudor, 23 Pick. 444; R. M. Charlton (Geo.) 267."

In the case of Forster v. Sheridan Trust & Savings Bank, 257 Ill. App. 463 the question arose as to whether a release of one party discharged the other parties. The principal ground urged for a reversal of the judgment of the trial court was that one Behrens was a partner of the deceased and that, therefore, the release given to Behrens had the legal effect of releasing the estate. The court, at page 471, had this to say:

"We think it is evident, from all the facts and circumstances, that the so-called release was executed and delivered for the sole purpose of attempting to remove any doubt as to the competency of Behrens as a witness in the probate court. Behrens testified that he thought the document was executed in the anteroom of Judge Horner's court room. He further said that, at the time, he had been sworn as a witness and was testifying in the probate court with reference to the claim involved on this appeal. Certainly it was not the intent of the claimant to release the estate at the very moment he was engaged in prosecuting his claim against it.

"Many authorities are cited, by counsel for the estate, holding that a party executing a release is bound by the legal effect of the words used regardless of ignorance of their import or of an intention to accomplish a different result. To apply the strict rule to the instant case, would, in our opinion, result in an injustice. We think that the rule stated in Parmelee v. Lawrence, 44 Ill. 405, is applicable to the facts in this case. . . ."

In the instant case it certainly was not the intention of plaintiffs to release defendant Skelly at the very moment they were engaged in attempting to enforce their judgments against it.

In the case of Reams v. Janoski, 268 Ill.App. 8, decided on the pleadings in the lower court, this court held in reversing and remanding the cause that a party to a written contract in a suit against a stranger to the contract may introduce parol evidence to show

30

that a written release of a joint tort feasor, not a party to the suit, was intended as a covenant not to sue.

In the case of Esser v. Community Consol. School Dist., 335 Ill. App. 199, the Appellate Court reiterated the language in the Parmelee case by stating that a release must be so construed as to carry out the intention of parties, and this intention is to be sought in the language of the instrument when read in the light of the circumstances surrounding the transaction, and that the court which interprets a release must place itself as nearly as possible in the position of the parties when they acted.

When we look at these instruments as a whole it is apparent that what the parties had in mind was the desire by the defendants, Bunge's and Foundation, to buy their peace and pay for a termination of litigation against them, even if not guilty of any wrongdoing, and the desire of the plaintiffs to collect substantial sums on a substantial judgment. We are of the opinion that the instruments above referred to amount to what they state they are, i. e., Covenants Not To Sue, in and by which plaintiffs reserved their rights against defendant, Skelly, and in and by which, (under the authority of Aldridge v. Morris, supra, and other like cases,) such payments may be credited on any liability which may be found to exist against other persons whose tort liability arises out of the same circumstances.

The bonds executed between plaintiffs, the surety companies and the Bunge's and Foundation, were to insure performance by plaintiffs of their unexecuted agreements not to sue attached to the bonds and in our opinion cannot be construed as releases, or as accords and satisfactions.

As to the quit claim deeds executed by the plaintiffs to the Bunge's as to separately described parcels of real estate, these instruments are in the usual and customary form for conveyances of real property.

31

They include the names of the grantors and grantees, the consideration, and a description of the property. A quit claim deed conveys only the grantor's interests in the property described therein. The judgment is not mentioned in any of the quit claim deeds. The judgment is not extinguished or discharged by reason of such quit claim deeds, but the lien only of said judgments is waived as to the property described therein. This is not unlike a partial release executed by mortgagee to mortgagor which is limited solely to the realty described therein, and which reserves the lien of the mortgage on other property described in the said mortgage.

On the question of whether it was negligence to connect the cylinder of "Skelgas" to the Chinook Wind Salamander Space Heater without using an automatic safety shut-off device, defendant Skelly contends that the negligence, if any, was the negligence of defendant Bunge's for which Skelly would not be liable. On the other hand plaintiffs contend that defendant Skelly is liable for this negligence because: 1, Bunge's were agents and servants of defendant Skelly; 2, that because of the inherently dangerous characteristics of "Skelgas," defendant Skelly had a nondelegable duty to see that an automatic safety shut-off device was used, so that defendant Skelly is estopped to deny that Bunge's were its agents; or 3, that defendant Skelly negligently permitted untrained and incompetent persons, to-wit: Bunge's to act as its distributors in marketing a highly dangerous commodity "Skelgas."

It is contended by defendant that the court erred in submitting to the jury the question of the existence of an agency or employee relationship between Bunge's and Skelly with respect to the particular transaction out of which plaintiffs alleged their injuries arose. The law is clear that generally a master is liable for the acts of his servant and that a principal is liable for the acts of his agent, but that generally

■■■■■■■■

neither is liable for the acts of an independent contractor. Usually an agent is paid differently, has more freedom of action, and requires less supervision than a servant. An agent usually has more authority, works alone and has some discretion, not being subject to constant supervision and control of the principal. Unless the relationship is so clear as to be undisputed, the relationship between principal and agent is a question of fact for the jury to determine from all the evidence. The Supreme Court of Illinois has frequently stated that the right or duty to supervise and control, and not the exercise of the right, determines the relationship. The relationship of principal and agent exists if the principal has the right or duty to supervise and control and to terminate the relationship at any time, even though he does not exercise that right. Hartley v. Red Ball Transit Co., 344 Ill. 534, 539; Lawrence v. Industrial Com., 391 Ill. 80, 87; Darner v. Colby, 375 Ill. 558; Shannon v. Nightingale, 321 Ill. 168.

■■■ While defendant Skelly places particular emphasis on that part of the written Distributor Agreement between Bunge's and defendant Skelly which recites that Bunge's are the agents of defendant Skelly only for the purpose of leasing "Skelgas" equipment to "Skelgas" consumers, plaintiffs not being parties to the agreement are not conclusively bound by its terms. Other evidence tending to prove what the true relationship was between Bunge's and defendant Skelly was admissible to be considered by the jury as a question of fact in determining if Bunge's were the agents of defendant Skelly. Komorowski v. Boston Store of Chicago, 263 Ill. App. 88, 95; Washburn & Moen Manufacturing Co. v. Chicago Galvanized Wire Fence Co., 109 Ill. 71, 79; Reams v. Janoski, supra p. 12; Northern Assur. Co. v. Chicago Mut. Building & Loan Ass'n, 198 Ill. 474, 477, 478; Hartley v. Red Ball Transit Co., supra, p. 542.

Bunge's were the agents of defendant Skelly to lease "Skelgas" equipment to "Skelgas" consumers. Defendant Skelly argues that this equipment included only regulators and that Bunge's were agents of defendant Skelly only to lease regulators. Bunge's appliance manager, Fred Wascher, Jr., testified that Bunge's was engaged in the business of selling petroleum products such as gas, oil and appliances. They sold the products of Skelly as a dealer. The cylinders of LP gas were owned by Skelly and were never sold by Bunge's. The title to the cylinders containing the LP gas was kept by Skelly. He further testified

"We had regulators also belonging to Skelly Oil Company. That's all the equipment we had belonging to Skelly Oil Company, cylinders and regulators."

Paragraph 5 of Distributor's Agreement provides that the containers (cylinders), were owned by defendant Skelly and required Bunge's to handle, account for, and return to Skelly, all "Skelgas" cylinders including those in the hands of consumers. Bunge's kept records of all incoming and outgoing cylinders, so that defendant Skelly knew where the "Skelgas" and cylinders were at all times. This is how defendant Skelly was able to pick up the Morgan Cylinder, cylinder No. 789,328, which was introduced into evidence in this case. In Canadian Radium & Uranium Corp. v. Indemnity Ins. Co., 348 Ill. App. 171, 179, the court said:

"And where one puts property in the hands of another to keep or manage, the relation is that of principal and agent."

Defendant Skelly owned the cylinders and other utilization equipment which was leased or loaned to consumers by Bunge's for defendant Skelly on forms prepared by defendant Skelly. The parties to the lease agreement were the "Skelgas" consumer and defendant Skelly. In addition to the Distributor's Agreement, defendant Skelly issued an Operations Manual in-

34

structing and requiring Bunge's to do certain things in handling and installing "Skelgas" and the equipment owned by defendant Skelly. The Operation Manual of defendant Skelly required Bunge's to keep a Consumer's Record for defendant Skelly. Bunge's kept such record for defendant Skelly relative to the sale to Sevrin Swaback in this case. The Customer's Sales Record kept by Bunge's for defendant Skelly had printed on its face, "Property of Skelgas Division, Kansas City, Missouri." Bunge's were also required to keep, and did keep, for defendant Skelly, a record of incoming and outgoing cylinders. This record has printed on its face "Skelgas is sold with the understanding that cylinders in which Skelgas is contained is property of Skelly Oil Company, and is merely loaned, and must be returned within 6 months from date of delivery. Right is reserved to remove same as soon as empty and in any event whether empty or not, without refund on or after 6 months from date." Defendant Skelly required Bunge's to maintain a delivery service to deliver "Skelgas" and to have the delivery man connect the cylinders to the consumer's equipment. It was the delivery man's responsibility to follow the instructions of defendant Skelly before hooking up a cylinder of "Skelgas." Defendant Skelly required Bunge's to notify defendant Skelly of a change in consumer's location and to make arrangements to reinstall the "Skelgas" utilization equipment at the new address or if consumer moved out of distributor's territory then to notify defendant Skelly giving certain required information. If a consumer violated any of the provisions of the Skelgas Consumer Agreement by improperly using "Skelgas" equipment or cylinders, Bunge's repossessed, for defendant Skelly the utilization equipment including cylinders from the customer. Defendant Skelly operated a training school to instruct Bunge's employees on the proper method of connecting

35

"Skelgas" cylinders and utilization equipment to the consumer's equipment. Defendant Skelly furnished a field man to work with Bunge's service man, George Miller, when he was first hired to call on customers and make installations. Representatives of defendant Skelly made regular calls at Bunge's and defendant Skelly held periodic meetings at Bunge's relative to the installation and use of liquid petroleum gas; men from other dealers as well as Bunge's attended these meetings. The liquid petroleum gas is sold as "Skelgas," defendant Skelly's trade name, in cylinders owned by defendant Skelly and on which "Skelgas" is stenciled. Each cylinder is sold by a serial number which is stamped on the cylinder itself and a record kept.

Marvin Peterson, Assistant Regional Manager of the Milwaukee region for Skelly Oil Company, testified for defendant. On cross examination, he said:

"When I talked about an automatic cut-off, I was referring to a 100 per cent automatic cut-off that Skelly has on their appliances. The appliances that I testified to that did not have an automatic cut-off were gas ranges, and usually someone would be in a kitchen while they were in use; and hot plates which most often are installed in a basement; and coffee makers and commercial ranges.

"In regard to whether Skelly Oil Company requires appliances which are to be left unattended, to have an automatic cut-off on them, I would say that the final test is whether or not an appliance would be safe to use under the conditions which it is going to be used, and that would depend upon the location, the use to which it is going to be put, and also whether or not anyone is going to be in attendance at all times.

"Skelly Oil Company recommends that Skelgas not be connected up to a hot water heater that does not have a safety cut-off on it. . . . If I, as assistant

36

regional manager, found a hot water heater without a shut-off valve on it, connected to Skelgas, I would suggest to the dealer that had been making the deliveries of Skelgas that the Skelgas be discontinued. If he didn't follow my suggestion, I would probably suggest it a second time. If he didn't follow it the second time, I wouldn't do anything. . . .

"A space heater device usually has an automatic cut-off. I believe, as of today, all of those sold by Skelly do. They have the automatic cut-off because the heating appliance is very often left unattended, and because they are installed in out of the way rooms, basements, milk houses and that type of thing.

"If you don't have an automatic 100 per cent cut-off valve on the appliance, and the flame goes out, the gas would continue to flow and it would collect in the room the appliance was located in. Whether it would lay along the floor, would depend on a great many things. . . .

"I think that every appliance Skelly sells that is intended to be left unattended has a cut-off on it. Skelly makes no requirements of its dealers, only suggestions.

"Q. You say they are suggestions. Are you familiar with this langauge in the service bulletin dated August 30, 1950?

"Mr. Johnson: I object to him quoting from the bulletin.

"The Court: He may.

"Q. It read:

"In the interest of safety for all concerned, and as a result of Skelgas laboratory tests, there are 4 factors of utmost importance which must be followed by all Skelgas dealers and Skelgas retail stores. Automatic water heaters for use on Skelgas should be: Heaters must be vented, factory fabricated to burn LP gas, A.G.A. approved for LP gas, and embody a 100 per cent thermo-couple safety cut-off."

"Mr. Johnson: That is objected to, he is still talking about water heaters.

"The Court: He may answer the question.

"A. I would say that is a recommendation by Skelly Oil Company and not a requirement. . . .

"We ask our distributors to report immediately any occurrences involving Skelgas at the earliest possible time to an authorized representative of Skelly Oil Company."

As soon as the explosion occurred in this case, Bunge's pursuant to such instruction from defendant Skelly, reported the explosion to defendant Skelly, and defendant Skelly, not Bunge's made the investigation.

In this court's opinion there was sufficient evidence to take the case to the jury as to the relationship existing between defendant Skelly and Bunge's and we cannot hold as a matter of law that the jury and the court erred in holding Skelly liable.

Plaintiffs alleged that "Skelgas" is highly combustible, violently explosive and "imminently," and "inherently" dangerous; especially so when connected without an automatic shut-off device to a salamander space heater; that defendant Skelly had the duty to use such care in the conduct of its business so no harm would come to plaintiffs; that defendant Skelly failed to properly train the personnel distributing "Skelgas" or to ascertain that the space heater did not have an automatic safety shut-off device. The evidence in this case is to the effect that liquid petroleum gas is a highly dangerous commodity, so that defendant Skelly was required to exercise a high degree of care in dealing commercially with it. Masters v. Central Ill. Electric & Gas Co., 7 Ill.App.2d 348, 358; Aurora Gas Light Co. v. Bishop, 81 Ill. App. 493, 500. This brings us to the question of whether or not defendant Skelly had a nondelegable duty to see that an automatic safety shut-off device was used to connect the cylinder

38

of "Skelgas" to the Chinook Wind salamander space heater in this case. In Van Auken v. Barr, 270 Ill. App. 150, at 153, the court quoted with approval from Vol. 39 of Corpus Juris, page 1331,

"A very important exception to the general rule exempting the contractee from liability for injuries caused by the negligence of an independent contractor or his servants is that where the work is dangerous of itself, or as often termed as 'inherently' or 'intrinsically' dangerous, unless proper precautions are taken, liability cannot be evaded by employing an independent contractor to do it."

Defendant Skelly as manufacturer or producer of a dangerous commodity is liable for injuries due to its negligence caused by such commodity to those persons whom defendant Skelly should expect to use the commodity, notwithstanding Skelly may have employed some middle man, either as agent or independent contractor, to market the commodity. Beadles v. Servel Incorporated and Union Gas and Electric Co., 344 Ill. App. 133, 145; Van Auken v. Barr, supra; City of Joliet v. Harwood, 86 Ill. 110, 111; Andronick v. Daniszewski, 268 Ill. App. 543, 548; Village of Jefferson v. Chapman, 127 Ill. 438, 444; FitzSimons & Connell Co. v. Braun & Fitts, 199 Ill. 390; Opal v. Material Service Corp., 9 Ill.App.2d 433.

An owner of an automobile, not of itself inherently dangerous, has been said to be liable for permitting an inexperienced or incompetent driver, not his agent or servant, to use the automobile. Union Bank of Chicago v. Kalkhurst, 265 Ill. App. 254. The owner of real property leased to another has been held liable for the negligent acts of an independent contractor hired by the lessee to raze a brick building. Van Auken v. Barr, supra. The owner of real property has been held liable for the negligent acts of an independent contractor employed to paint a building. Andronick v. Daniszew-

ski, supra. A contractor has been held liable for the negligent acts of an independent sub-contractor for leaving dynamite on a roadway. Haas v. Herdman, 284 Ill. App. 103. A gas company has been held liable for the negligent acts of an independent contractor in laying pipe lines. Chicago Economic Fuel Gas Co. v. Myers, 168 Ill. 139. A village has been held liable for the negligent acts of an independent contractor employed to grade a street. Village of Jefferson v. Chapman, supra. A city has been held liable for damages resulting from use of dynamite by an independent contractor in constructing a sewer. City of Joliet v. Harwood, supra. The manufacturer of a gas refrigerator has been held liable to a second-hand purchaser for carbon monoxide poisoning resulting from use of the refrigerator. Beadles v. Servel, Incorporated & Union Gas & Electric Co., supra.

Defendant Skelly had the duty to exercise a high degree of care in selecting, training and inspecting its distributors. Masters v. Central Ill. Electric & Gas Co., supra; Aurora Gas Light Co. v. Bishop, supra. Reading of the testimony of the partners, Arthur Bunge and Otto Deters, shows that defendant Skelly's distributor Bunge's knew nothing about the dangerous characteristics, safety devices or proper use of liquid petroleum gas and had never been instructed by defendant Skelly. The same is true of the testimony of Milton Eberly, who was employed by Bunge's in the appliance department, and Fred Wascher, Jr., the manager of Bunge's appliance department and the man in charge of selling "Skelgas." Arthur Bunge made this statement,

"The employees must have learned some of the rudiments of the gas. By that I mean, that it came in bottles and how to hook up the regulators. I, myself, didn't ever handle it. I did not find out how much the employees had learned about the use of 'Skelgas'."

40

Otto Deters testified,

"I do not know what a safety cut-off device is. I do not know whether or not Bunges, at the time they make installations, make any inspection and I have not made any investigation as to what precautions, if any, are taken by the Appliance Department through its manager or installer or anybody else."

Bunges employed George Miller to deliver and install "Skelgas". Neither George Miller nor Fred Wascher had any knowledge concerning salamanders. Both had the impression that a regulator was all that was needed to install a salamander. Miller told Swaback, plaintiffs' employer, that he had all necessary controls for the salamander in this case. Both Miller and Wascher knew that automatic cut-off devices were available, but Bunge's did not have any; defendant Skelly did not require Bunge's to supply automatic cut-off devices. Defendant Skelly operated a service and sales training school, but did not require dealers to attend the school. Defendant Skelly issued periodical bulletins on installing and servicing "Skelgas," but defendant Skelly made no effort to assure their reading; the bulletins sent to Bunges were laid aside and seldom read. Defendant Skelly made no inspection to see that necessary safety precautions were taken or safety cut-off devices used. Defendant Skelly made no effort to instruct or require instruction of the ultimate consumer of "Skelgas" as to its intrinsic danger, proper use or necessary safety precautions.

 There was sufficient evidence in this case to take the question of defendant Skelly's negligence to the jury, and the verdict of the jury and the judgment of the court is supported by the evidence in this case.

 Defendant Skelly contends that the court erred in submitting the question of odorization to the jury and that the verdict was against the manifest

weight of the evidence. The testimony in this case on behalf of plaintiffs is that liquid petroleum gas is odorless and it is necessary that a malodorant be added so that its presence is noticeable to people coming in contact with it. The odor increases in proportion to the amount of malodorant added. Plaintiff, Delbert Hulke, the only person in the basement prior to the explosion testified that he did not smell any malodorant allegedly added to the "Skelgas." Five firemen and one police officer were in the basement after the explosion for as long as twenty-five minutes. Five of them were near enough to the cylinder of "Skelgas" to clear the debris away from the cylinder and to lift up and remove the cylinder from the basement; all except one of them were familiar with the customary smell of the malodorant usually added to liquid petroleum gas; they heard the hissing of gas escaping from an uncapped cylinder which they removed from the basement, but did not smell any malodorant. Defendant contends that this is only negative evidence; that the legal obligation to odorize is to one-fifth the lower limit of combustibility and that evidence contrary to physical facts should not be considered. In Murray v. Pennsylvania R. Co., 347 Ill. App. 218, 223 the court said: "It is well settled that negative evidence is admissible where the attending circumstances show that it has probative value." In McDaniels v. Terminal R. Ass'n of St. Louis, 302 Ill. App. 332 testimony of plaintiff that he did not hear defendant's servants shout "look out below," as opposed to the affirmative statements of defendant's servants that they did so shout, was considered sufficient to make a question of fact for the jury as to whether or not such words were shouted. At page 352, the court said: "While negative testimony may not be of as much weight as positive testimony, the weight and credibility of both are for the determination of the

42

jury (Noonan v. Maus, 197 Ill. App. 103)." While defendant contends that it had no duty to plaintiff, Delbert Hulke, other than to add sufficient malodorant to satisfy the requirements of Pamphlet 58 of the National Board of Fire Underwriters, Skelly owed plaintiff a duty to exercise ordinary care to avoid injury to plaintiff which might naturally flow as a reasonably probable and foreseeable consequence of its act. Wintersteen v. National Cooperage & Woodenware Co., 361 Ill. 95, 103. One of plaintiffs' witnesses, Edward C. McLean, an industrial engineer, a member of the American Gas Association since 1940 and the Liquefied Petroleum Gas Association since 1946, testified that he was manager of the National Machine Works in Chicago, Illinois, a company engaged in the business of manufacturing gas valves, fittings, artificial gas making machines, special machinery in the gas industry, gas burners and combustion equipment, and that his occupation as an industrial engineer consisted of laying out and supervision of installation and the instruction of operation of liquefied petroleum gas plants, since 1946. He testified that he was familiar with the custom and practices as to the installation of appliances using liquefied petroleum gas, and the reasons for the automatic cut-off which will cut off the main gas supply to the equipment if the burner or the pilot burner should fail, and that the custom and the usage in the industry on January 1, 1953 was to add more malodorant than is required by Pamphlet 58. Proof of compliance with statutory requirements is some evidence tending to show due care, but is not conclusive on the question of negligence. Neering v. Illinois Cent. R. Co., 383 Ill. 366, 381; Bales v. Pennsylvania R. Co., 347 Ill. App. 466, 474, 475; Wagner v. Toledo, P. & W. R. R., 352 Ill. 85, 91. Pamphlet 58 was adopted to require at least a certain minimum amount of malodorant to indicate positively by a dis-

43

tinctive odor the presence of gas before the mixture of gas and air become combustible. The pamphlet does not establish any maximum amount of malodorant which may be added. Whether or not defendant Skelly added sufficient malodorant to indicate the presence of gas in the basement prior to the explosion was a question of fact for the jury to determine. It is the jury's function to determine the facts, disputed as well as undisputed, and to make reasonable inferences therefrom. Tennant v. Peoria & P. U. Ry. Co., 321 U. S. 29; Lavender v. Kurn, 327 U. S. 645; Lindroth v. Walgreen Co., 407 Ill. 121, 133, 135; Bonnier v. Chicago, B. & Q. R. Co., 2 Ill.2d 606, 611, 613; Beverly v. Central Illinois Electric & Gas Co., 5 Ill.App.2d 27, 36; Allendorf v. Elgin, J. & E. Ry. Co., 8 Ill.2d 164, 171. We cannot say as a matter of law that the verdict was not properly supported by the evidence. The record, in our opinion, contains sufficient evidence to establish a reasonable basis from which the jury could conclude that defendant was guilty of the negligence charged, and in that state of the record we would not be justified in substituting our conclusions for those of the jury. Beverly v. Central Illinois Elec. & Gas Co., supra.

 ██ The defendant's contention that the plaintiff was guilty of contributory negligence as a matter of law is untenable. The question of contributory negligence is ordinarily one of fact for the jury to decide under proper instructions. Contributory negligence becomes a question of law only when it can properly be said that all reasonable minds would reach the conclusion, under the facts stated, that such facts did not establish due care and caution on the part of the person charged therewith. Thomas v. Buchanan, 357 Ill. 270, 277; Markus v. Lake County Ready-Mix Co., 6 Ill.App.2d 420. In the instant case there was sufficient evidence in the record to go to the jury upon

44

the issue as to whether the plaintiff, at the time of the incident in question was in the exercise of ordinary care and caution for his own safety. His actions would seem to be consistent with those of a person of ordinary prudence under like circumstances.

■ The question of due care on the part of the plaintiff is always a question of fact to be submitted to a jury whenever there is any evidence in the record which, with any legitimate inference that may reasonably and legally be drawn therefrom, tends to show the exercise of due care on the part of plaintiff. McManaman v. Johns-Manville Corp., 400 Ill. 423; Ziraldo v. Lynch Co., 365 Ill. 197; Thomas v. Buchanan, supra, p. 278; Palmer v. Loveless, 342 Ill. App. 60; Pennington v. Rowley Bros. Co., 241 Ill. App. 58, 67. From the evidence in this case it appears that plaintiff had very little knowledge as to the operation of the dangerous instrumentality which had been placed in the basement to keep the concrete from freezing. We cannot say that he failed to exercise due care.

■ Defendant contends that the court erred in failing to find the plaintiff, Delbert Hulke, guilty of contributory negligence as a matter of law and in failing to find that said plaintiff did not sustain the burden of proving his exercise of ordinary care; and that the jury's verdict was against the manifest weight of the evidence. It is not the province of this court to substitute its judgment for that of the jury, or to upset the verdict even if it were to reach a contrary conclusion, for that would be invading the constitutional prerogative of the jury. Bliss v. Knapp, 331 Ill. App. 45, 50. To be against the "manifest weight of the evidence" requires that an opposite conclusion be clearly evident. Olin Industries, Inc. v. Wuellner, 1 Ill.App.2d 267, 271; Schneiderman v. Interstate Transit Lines, Inc., 331 Ill. App. 143, 147. We cannot say that the

45

judgment is against the manifest weight of the evidence in this case.

■ ■ On motion for judgment notwithstanding the verdict, or for a directed verdict, the court does not weigh the evidence. The court may properly consider only the evidence and inferences most favorable to the plaintiff; and it is only where there is no evidence tending to prove plaintiff's case that the court can grant either a motion for directed verdict, or judgment notwithstanding the verdict. Lindroth v. Walgreen Co., 407 Ill. 121, 130; Beverly v. Central Illinois Electric & Gas Co., supra. The trial court may only grant judgment notwithstanding the verdict if, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of plaintiff's case. Heideman v. Kelsey, 414 Ill. 453, 457; Hall v. Chicago & North Western Ry. Co., 5 Ill.2d 135, 140. In this case there was evidence to support the finding of the jury and the trial court properly refused to grant the motion for judgment notwithstanding the verdict.

■ The matter of granting a new trial is in the sound discretion of the trial judge. Parke v. Lopez, 306 Ill. App. 486; Ledferd v. Reardon, 303 Ill. App. 300; Josate v. Mack, 302 Ill. App. 246. As was said in Josate v. Mack, at page 248:

"Necessarily, the trial court should have the discretion to decide with finality whether a new trial is necessary in the interests of justice, as it is in his power to observe the multiplicity of situations as they arise during the progress of the trial and is in a better position to weigh the effect upon the jury and to judge whether or not substantial justice had been done."

On the question of the evidence, the trial judge must be accorded considerable discretion, and his judgment is accorded greater latitude than on questions of law.

46

Loucks v. Pierce, 341 Ill. App. 253. The presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility. The trial judge is in a better position than a court of review to weigh the evidence. The allowance or refusal of the motion is largely within the discretion of the trial court. His decision is subject to review, but it is commonly said that it will not be reversed except for a clear abuse of discretion. Gavin v. Keter, 278 Ill. App. 308; In re Estate of Velie, 318 Ill. App. 550; Chapman v. Baltimore & Ohio R. Co., 340 Ill. App. 475; Matkins v. Fenorsky, 348 Ill. App. 125.

 Defendant Skelly contends that the verdict for Delbert Hulke is so large that the verdict itself demonstrates that the jury was influenced by passion and prejudice and by pity and sympathy—matters which can have no part in the determination of monetary damages; that the verdict is grossly excessive and is contrary to the evidence in the record, and is against the manifest weight of the evidence and that the case should be reversed on the basis of the excessiveness of the verdict.

In its brief, defendant Skelly states: "That the plaintiff, Delbert Hulke, was seriously injured cannot be denied. The very seriousness of his injuries leads to the inescapable conclusion that the jury could not help but feel pity and sympathy toward him."

At the time of the explosion Delbert Hulke was 29 years of age and at the time of the trial he was 31. Numerous medical bills were introduced which total, $52,931.43. Up to the time of trial, Hulke's lost wages were $14,742.00. To review extensively the injuries received by plaintiff, Delbert Hulke, would require setting forth the testimony of the attending physicians, Dr. John C. Schmidtke and Dr. William F. Lauten, and

47

of the nurses, which would unduly extend the length of this opinion. Suffice it to say that the testimony disclosed that the skin and flesh was burned off 80 per cent of his body (over 65 per cent of his body was third degree burns) so that his muscles were visible, both external ears had been destroyed, a mass burn involving the face, scalp, upper and lower extremities as well as a large area of the body was recorded by one of the physicians, the lower eyelids were everted; two finger bones on the right hand had to be amputated at the junction of the second joints because the knuckles were burned so deeply that the joints were opened; his teeth were damaged and he had partial loss of vision in both of his eyes; the tissue and muscles on the interior part of his lower legs were burned so badly that he cannot support his feet nor balance himself and he has to wear braces on both feet. He has loss of function of the fingers not amputated, of both hands and the right elbow. He was confined in a hospital for fourteen months, from March 1, 1953 to May 13, 1954, and thereafter returned to the hospital every day for six or seven months for treatment; he had 63 operative procedures during that time. The testimony of one of his physicians was to the effect that they had to resort to as much narcotic as possible to relieve him of as much pain as possible, to do his dressing. For almost four months from March 1, 1953 to June 22, 1953 he was unable to turn in bed because of the pain and he had to be forcibly rolled over. On June 22, 1953 he was fitted with a Stryker bed or a frame so that he could be turned over without touching or hurting him so much. An oxygen tent was used much of the time during his early care, and whenever indicated after that. From March 1, 1953 to August 20, 1953 he was not out of bed. On August 20, 1953 he was lifted by a canvas hoist, so as to dip him in a sterile water bath. For over five months, until

August 1953 he was irrational. In the opinion of one of the doctors, plaintiff Delbert Hulke has a 100 per cent disability from an industrial angle.

 The amount of damages is primarily a question of fact for the jury to determine. The court has no right to substitute its judgment for that of the jury. Smith v. Illinois Cent. R. Co., 343 Ill. App. 593, 612; Wabash, St. L. & P. Ry. Co. v. Peyton, 106 Ill. 534, 539; Chicago, B. & Q. R. Co. v. Warner, 108 Ill. 538, 545, 548; Illinois C. R. Co. v. Cole, 62 Ill. App. 480, 495; Howard v. Baltimore & Ohio Chicago Terminal R. Co., 327 Ill. App. 83, 100 to 107; Illinois C. R. Co. v. Harris, 63 Ill. App. 172, 178; Ford v. Friel, 330 Ill. App. 136, 140.

In approving $185,000 damages in Smith v. Illinois Cent. R. Co., supra, at page 612, the court said:

"The question of damages to be assessed in this kind of a case is one of fact for the jury. . . . There is nothing in the record which would justify a conclusion that the jury's finding of damages was against the manifest weight of the evidence.

"We are asked to find that the assessment was excessive. We need not cite authority for the statement that we must consider the fact that this verdict reflects an inflationary period in our economy. The question of excessiveness is not to be determined by what we as judges think the damages should have been. The question is whether reasonable men might differ in their answers to the question. We cannot say that reasonable men would not differ on the question whether $185,000 was too great an amount to allow plaintiff who was so badly injured, in consideration of his wages at the time of the accident and his probable earnings during his expectancy; of the pain and suffering he has undergone and will undergo; of the deprivation of the privileges and enjoyments common to men in like circumstances (Howard v. Baltimore

49

& O. C. T. R. Co., 327 Ill. App. 83); and his medical expenses and the probable expenses of attending him in the future. Because we think reasonable men might differ on this question, we cannot say that the jury was moved by passion."

 It is contended by defendant Skelly that the court erred in permitting Delbert Hulke to exhibit to the jury his leg injuries and braces. In view of defendant's vigorous and lengthy argument to the effect that the verdict of the jury is grossly excessive, and in line with our ruling in Stegall v. Carlson, 6 Ill.App.2d 388, 391 wherein this court had occasion to review the authorities on this subject, we do not think the trial court abused its discretion in this respect.

 Other errors are charged in the admission of certain evidence for plaintiffs and in the exclusion of certain evidence offered by defendant Skelly. We are of the opinion that the court's rulings on these matters did not prejudicially affect the rights of defendant. As said by the Supreme Court in People v. Storer, 329 Ill. 536, 542:

"The object of the review of judgments of trial courts by courts of appellate jurisdiction is not to determine whether the record is free from error but to ascertain whether a just conclusion has been reached, founded upon competent and sufficient evidence, in a trial in which no error has occurred which might be prejudicial to the defendant's rights."

Defendant Skelly contends that the court erred in refusing to give the following special interrogatories:

I

"Was the gas at and prior to the accident in question odorized so as to positively indicate its presence by a distinctive odor when the gas was present in air in a combustible mixture?"

## II

"Was the gas at and prior to the time of the accident in question odorized as required by the Rules and Regulations of the Department of Public Safety of the State of Illinois so as to positively indicate its presence by a distinctive odor when the gas was in a concentration in air of not over one-fifth the lower limit of combustibility?"

█ A special interrogatory is not proper unless it relates to one of the ultimate facts upon which the rights of the parties directly depend and unless the answer responsive thereto would be inconsistent with some general verdict which might be returned upon the issues in the case. Interrogatories which ask for a special finding as to evidentiary facts are never proper, even though ultimate facts may be deduced therefrom by reason or argument. Wicks v. Cuneo-Henneberry Co., 319 Ill. 344, 349, 350; King v. Ryman, 5 Ill.App.2d 484, 125 N.E.2d 840; Chicago & N. W. Ry. Co. v. Dunleavy, 129 Ill. 132, 141, 148; C. & A. R. R. Co. v. Gore, 202 Ill. 188, 193, 194; Packard v. Kennedy, 4 Ill.App.2d 177, 186; Stevenson v. Byrne, 3 Ill.App.2d 43, 48.

██ A special interrogatory must stand alone unaided by any presumptions or evidence in its favor. The court cannot look to the evidence to determine the propriety of a special interrogatory or whether or not an answer thereto was or would be inconsistent with a general verdict. Wicks v. Cuneo-Henneberry Co., supra; Chicago & N. W. Ry. Co. v. Dunleavy, supra. The court properly refused to give the special interrogatories to the jury.

██ Objection is made by defendant Skelly to the giving of certain instructions for plaintiffs and the refusal to give certain instructions for defendant. It would unnecessarily prolong the opinion to discuss each instruction in detail. Instructions are to be con-

strued in the light of what an ordinary person would understand them to mean. Analytical criticism is not the fair or just mode of examining an instruction. As the court said in Reivitz v. Chicago Rapid Transit Co., 327 Ill. 207, 213:

"The test, then, is not what meaning the ingenuity of counsel can at leisure attribute to the instructions, but how and in what sense, under the evidence before them and the circumstances of the trial, ordinary men acting as jurors will understand the instructions."

The proper approach in considering instructions is not whether each individual instruction is mechanically correct so as not to be subject to some technical objection, but whether or not the instructions when considered as a whole were sufficiently clear so as not to mislead the jury. As the Supreme Court said in Chicago City Ry. Co. v. Shaw, 220 Ill. 532, 536:

"We do not regard the instruction as one that should be given, as it is desirable to avoid inaccuracies of expression of legal propositions; but absolute accuracy is a thing seldom to be attained, and courts are not for the want of it, alone, to set aside verdicts, but are only justified in doing so in cases where the inaccuracy is of such a character that the court must feel that it is likely that the jury were misled thereby."

▆▆ After a careful consideration of the evidence and of the record in this case, we find no reversible error was committed and the judgments are accordingly affirmed.

Affirmed.

DOVE, P. J. and CROW, J., concur.